289 F.2d 86
 CONTINENTAL ORE COMPANY, a Partnership; and Henry J. Leir,
Erna D. Leir, Lina Schloss, as Individuals and as
Partners under the trade name and style
of Continental Ore Company, Appellants,
v.
UNION CARBIDE AND CARBON CORPORATION; United States Vanadium
Corporation; Electro Metallurgical Company; Electro
Metallurgical Sales Corporation; Electro Metallugical
Company of Canada, Limited; Vanadium Corporation of America,
Appellees.
 No. 16149.
 United States Court of Appeals Ninth Circuit.
 March 22, 1961, Rehearing Denied May 15, 1961.
 
 Joseph L. Alioto, Maxwell Keith, Richard Saveri and G. Joseph Bertain, Jr., San Franscisco, Cal., and Cadwalader, Wickersham & Taft, New York City, for appellants.
 Herbert W. Clark,Richard J. Archer and Girvan Peck, San Francisco, Cal., Morrison, Foerster, Holloway, Shuman & Clark, San Francisco, Cal., of counsel for appellees Union Carbide & Carbon Corp. et al.
 Pillsbury, Madison & Sutro, Francis N. Marshall, G, H. Eckhardt, Jr., San Francisco, Cal., Josiah G. Holland, Denver, Colo., Edward R . Neaher, New York City, for appellee Vanadium Corp. of America.
 Before MERRILL and MAGRUDER, Circuit Judges, and SOLOMON, District judge.
 MAGRUDER, Circuit Judge.
 
 
 1
 Plaintiffs filed in the court below a treble damage antitrust complaint against defendants. Plaintiffs, a partnership and the partners in it suing individually, are the successors in interest to a family corporation known as Continental Ore Corporation. Both the plaintiff partnership, Continental Ore Company, and the previous corporation will be referred to as Continental.
 
 
 2
 The guiding light in Continental has been and still is the plaintiff Henry J. Leir. Leir was born in Germany and entered the ore and metal business there. His enterprises in Germany involved for the most part the purchase of raw materials for metal producers and the sale of their finished products. Upon Hitler's rise to power Leir moved to Luxembourg, where he formed a company known as Societe Anonyme des Minerais. This corporation subsequently entered into a joint venture with the Societe d'ElectroChimie de Brignoud, a French company otherwise known as Fredet-Kuhlmann. Brignoud undertook to install equipment for the production of ferro-vanadium and other alloys by a process known as the alumino-thermic method; Minerais supplied the raw materials, and the profits were split evenly. In 1938 Leir moved again, this time to the United States. He organized the Continental Ore Corporation in 1939 under the laws of the State of New York.
 
 
 3
 The defendants named in the complaint are Union Carbide and Carbon Corporation, a New York corporation, United States Vanadium Corporation, a Delaware corporation, Electro Metallurgical Company, a West Virginia corporation, Electro Metallugical Sales Corporation, a New York Corporation, Electro Metallurgical Company of Canada, Ltd ., a Canadian corporation, and Vanadium Corporation of America, a Delaware corporation. Several other persons, whose names were unknown to the plaintiffs, were listed as Doe defendants.
 
 
 4
 The complaint states that, by means of a combination and conspiracy in violation of 1 and 2 of the Sherman Act, 15 U.S.C.A. 1 and 2, defendants eliminated the plaintiffs and their predecessor in interest, the Continental Ore Corporation, hereinafter included in the term plaintiffs, from the business of producing, selling and distributing vanadium oxide and ferro-vanadium. Plaintiffs claim that they made several forays into the vanadium industry, sometimes approaching the brink of success, other times not getting quite so far. Their inability to reach the desired goal in any of their various vanadium undertakings is the gist of their complaint. They ascribe their failures to defendants' alleged unlawful course of conduct.
 
 
 5
 Vanadium is a rare metallic element found for the most part in carnotite and roscolite ores. These vanadium-bearing ores are taken from the mines to the mills where they are 'crushed,' 'roasted' and 'leached' to form a substance called red cake. The red cake is then fused into a black oxide, which is called vanadium oxide, vanadic acid, vanadium pentoxide, or V(2),0(5). This oxide is then converted into ferro-vanadium through the application of great heat either by means of an electric furnace or by the alumino-thermic process. The ferrovanadium thus produced is used by steel makers in the steel bath to add toughness and tensile strength to the steel.
 
 
 6
 According to the complaint, the defendants frustrated the plaintiffs' sallies into the vanadium field in five particulars:
 
 
 7
 (1) In 1938 Leir negotiated a contract between Apex Smelting Company of Chicago (hereinafter 'Apex') and Societe d'Electro-Chimie de Bringnoud, the French corporation. Subsequently the plaintiffs were assigned one half of Brignoud's interest under the contract. The agreement provided that Apex was to build and operate a ferro-vanadium plant, using Brignoud's alumino-thermic method of conversion. Brignoud was to contribute the secrets of this process as its part of the project. Since the profits were to be divided equally between the two signatories to the agreement, the plaintiffs, as a result of the assignment to them, became entitled to one quarter of the profits realized from the arrangement. Plaintiffs were also appointed exclusive sales agents throughout most of the United States for the ferro-vanadium to be manufactured by Apex.
 
 
 8
 Production under this agreement was not actually begun by Apex until April, 1940. The agreement was terminated by Apex in the spring of 1942. According to the complaint, Apex ceased operations in ferro-vanadium and canceled the aforesaid agreement because a sufficient supply of oxide could not be obtained, this being attributed to defendants' antitrust violations. More specifically, in pursuance of their illegal combination and conspiracy, defendants were said to have refused to sell enough oxide to Apex and also to have prevented Apex from acquiring the necessary quantities of raw materials from other suppliers.
 
 
 9
 (2) In 1942, after the termination of the unfortunate Apex joint venture, the plaintiffs transformed rented premises on Long Island, New York, and there packaged a vanadium compound made up of vanadium oxide and small amounts of other materials, This compound, which was sold under the trade name Van-Ex, was designed for direct use in the steel bath where it could be converted into ferro-vanadium and mixed into the steel in one operation, thereby obviating the need to produce ferro-vanadium by a separate procedure. In 1944 the sale of Van-ex was discontinued because, according to plaintiffs' allegations, defendants' antitrust violations precluded the acquisition of sufficient oxide and ore. It is claimed that defendants refused to sell to the plaintiffs and prevented their securing raw materials elsewhere.
 
 
 10
 (3) During 1942 the plaintiffs sold substantial quantities of ferro-vanadium, apparently produced by Apex, and of Van-Ex to a Canadian company, Atlas Steels, Ltd. These sales ceased during 1943 because, as alleged, defendants agreed with Electro Metallurgical Company of Canada, Ltd., a wholly owned subsidiary of defendant Union Carbide, and the wartime agent of the Canadian Government for the purchase and allocation of vanadium products to Canadian steel firms, to eliminate Continental from the Canadian market. Pursuant to the agreement Electro Metallurgical Company of Canada refused, while exercising its powers as an agent of the Canadian Government, to purchase for and allocate to Canadian steel makers vanadium products made by the plaintiffs.
 
 
 11
 (4) During 1943, by threats of reprisals defendants allegedly forced the termination of contractual negotiations between Climax Molybdenum Corporation and the plaintiffs.
 
 
 12
 (5) In 1944 plaintiffs and Imperial Paper & Color Corporation entered into a contract much like the Apex arrangement above described, but providing in addition for the milling of oxide from vanadium ore. Imperial abandoned this contract before the production stage was ever reached because, according to the allegations, neither Imperial nor Continental was able to secure either ore or oxide with which to work as a consequence of defendants' refusal to sell supplies to them and of their actions which precluded the purchase of the same from other persons.
 
 
 13
 These five particulars by which defendants' alleged monopoly was purportedly furthered at Continental's expense are given as the reason for plaintiffs' assertion that after 1944 they could no longer operate profitably in the vanadium business. The complaint does not recite any particular activities by the defendants against the plaintiffs after 1944. In summary, plaintiffs complain that defendants conspired and combined to monopolize the production and sale of vanadium oxide and ferro-vanadium; that in pursuance of this monopolistic scheme defendants refused to supply vanadium oxide to the plaintiffs to carry on the business of producing ferro-vanadium; that defendants similarly refused to sell to plaintiffs sufficient vanadium oxide to continue the business of processing, packaging and selling Van-Ex; and that, in the course of their unlawful monopolistic conspiracy, defendants coerced the defection of one of plaintiffs' Canadian customers for ferro-vanadium and Van-Ex, namely, Atlas Steels, Ltd.; and moreover that defendants defeated the efforts by plaintiffs to enter into a successful arrangement with Climax Molybdenum Company for the production of ferro-vanadium. The complaint states that, owing to all this,
 
 
 14
 'Plaintiffs have lost business; the value of their trade-marks has been diminished; markets and customers which they have obtained in open competition with defendants have been taken away from them; their investments have been lost; the good will attaching to the business of Continental has been impaired-- all to the damage of plaintiffs in the sum of Five Hundred Twenty-Eight Thousand Dollars ($528,000).'
 
 
 15
 This amount the plaintiffs estimate they would have made from their various vanadium ventures had not the defendants committed the above listed acts as part of their unlawful conspiracy.
 
 
 16
 At the conclusion of the plaintiffs' case, and also when all the evidence was in, defendants moved for a directed vardict on the ground that there was insufficient evidence to establish the plaintiffs' claim to relief. The court took the motion under advisement but submitted the case to the jury, which reported a verdict for the defendants, with which verdict the trial judge noted his concurrence. Pursuant to this verdict the trial judge, on June 25, 1958, entered his judgment stating that 'the plaintiffs take nothing by their complaint and that the same be dismissed and that the defendants have judgment on the verdict against the plaintiffs'. It is this judgment which is now before us on appeal by the unsuccessful plaintiffs.
 
 
 17
 An appellate court reviews judgments, not the reasons which may be given in their support. It is only common sense that if, on the record before us, we determine that the judgment is correct, it should be affirmed, regardless of the correctness of the reasons which may be given to support it. Suppose that the trial judge had decided to direct a verdict for the defendants. He would, in that event, have entered a judgment to the same effect as the one under review. If we conclude that the trial judge should have granted defendants' motion for a directed verdict, we should affirm the judgment as rendered, whatever errors appellants may convince us were made by the judge during the trial.
 
 
 18
 This proposition is well settled on the authorities. See United States v. American Railway Express Co., 1924, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087; Stroud v. Benson, 4 Cir., 1958, 254 F.2d 448, 451; Lady Nelson, Ltd. v. Creole Petroleum Corp., 2 Cir., 286 F .2d 684. We think that the Fifth Circuit was quite wrong in Thurber Corp. v. Fairchild Motor Corp., 1959, 269 F.2d 841, in holding that the foregoing rule was required to be modified or rendered inapplicable by the reasoning of the Supreme Court in Cone v. West Virginia Pulp & Paper Co., 1947, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed . 849. This last-named case dealt with quite a different situation, namely, the power of an appellate court upon reversal of the district court where the losing party below had not moved for a judgment n.o.v. or, in the alternative, for a new trial, as provided in Rule 50 (b) F.R.Civ.P., 28 U.S.C.A. In the present case we propose to affirm the judgment of the district court. As late as 1957 the Supreme Court said, in Jaffke v. Dunham, 1957, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314, that, 'A successful party in the District Court may sustain its judgment on any ground that finds support in the record,' without any suggestion that this statement had to be modified to meet the reasoning of Cone v. West Virginia Pulp & Paper Co., supra.
 
 
 19
 In fact, in the situation presented we do not see how we could do otherwise than affirm the judgment under review if we would obey the commands of 28 U.S.C. 2111 and Rule 61 F.R.Civ.P. If we conclude that the trial judge should have granted defendants' motion for a directed verdict, it is not apparent how any alleged error at the trial could be deemed to 'affect the substantial rights of the parties' within the meaning of both 28 U.S .C. 2111 and Rule 61. In reaching our decision we shall look not only at all the evidence admitted by the trial judge, but also at all the evidence offered by plaintiffs but excluded below.
 
 
 20
 In a treble damage action under 15 U.S.C.A. 15, it is clear that the plaintiff, in order to make out a claim on which recovery might be had, has the burden of proof to establish the following elements of his case: (1) That the defendant has violated the antitrust laws; (2) that plaintiff has suffered an injury to his business or property susceptible of being described with some degree of certainty in terms of money damages; and (3) that a causal connection exists between the defendant's wrongdoing and the plaintiff's loss. See, generally, Comment, 61 Yale L.J. 1010, 1011-28 (1952). Although in the instant case the defendants challenged the sufficiency of the evidence as to the three elements of the plaintiffs' case, we shall first direct our analysis to the third element, the sufficiency of the evidence as to causation, because defendants' strongest argument seems to us to apply here. Of course, a failure by the plaintiffs to prove any one of the three elements of their case would require the trial judge to direct a verdict for the defendants.
 
 
 21
 For present purposes we shall assume that the evidence was adequate to support a jury finding that the defendants committed the violations of the Sherman Act claimed, and that the defendants did the acts mentioned as part of a plan to monopolize the marketing of ferro-vanadium. Our problem is to determine whether or not the evidence could have justified jury findings that defendants' alleged illegal acts were in fact the cause of the plaintiffs' failure in various adventures into the business of producing and selling ferro-vanadium and Van-Ex. We have come to the conclusion that the evidence offered by the plaintiffs was insufficient to justify a jury verdict that this necessary causal relation existed, and therefore that the trial judge should have directed a verdict for the defendants.
 
 
 22
 As the First Circuit recognized in Momand v. Universal Film Exchanges, Inc., 1948, 172 F.2d 37, 42-43:
 
 
 23
 'The degree of certainty required of a plaintiff in proving causation of damage is necessarily elastic. It varies with the nature of the case. Particularly in an anti-trust suit, covering as it must many imponderables, rigid standards of precise proof would make a plaintiff's task practically hopeless.
 
 
 24
 'To sum up: It is well appreciated that a plaintiff has a difficult task in an anti-trust suit and that adherence to strict requirements of proof as to exact quantity of damage may deprive him of the substance of his rights. The law has gone far to ease that burden by permitting proof of losses which border on the speculative, in order to implement the policy of the anti-trust laws . But a fair degree of certainty is still essential to show the causative relation of defendants' misconduct and plaintiff's injury.'
 
 
 25
 No doubt, a plaintiff's difficulties of proof may be somewhat mitigated by a rule much akin to the doctrine of res ipsa loquitur: where the plaintiff proves a loss, and a violation by defendant of the antitrust laws of such a nature as to be likely to cause that type of loss, there are cases which say that the jury, as the trier of the facts, must be permitted to draw from this circumstantial evidence the inference that the necessary causal relation exists. Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. See also Eastman Kodak Company of New York v. Southern Photo Materials Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L .Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. See Martin v. Herzog, 1920, 228 N.Y. 164, 170-171, 126 N.E. 814, 816 .
 
 
 26
 But we are not sure that Bigelow v. RKO Pictures, Inc., supra, is applicable in the instant case. Appellants have complained of the loss of a few named, specific, business arrangements rather than a general loss inflicted by the defection of countless, individual customers. Direct evidence of causation was readily available to Continental, while in the case cited such direct evidence was practically impossible to come by. See Generally, Clark, 'The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits,' 52 Mich.L.Rev. 363 (1954). Yet, even if the Bigelow decision could be enlisted to serve appellants' purposes, it was still incumbent upon them to show on the trial that their reiterated lack of supplies was the result of defendants' refusals to deal with them and of defendants' efforts to prevent them from obtaining raw materials elsewhere. See Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 2 Cir., 1959, 268 F.2d 246, 251, certiorari denied 1959, 361 U.S. 885, 80 S.Ct, 156, 4 L.Ed.2d 121; Standard Oil Company of California v. Moore, 9 Cir., 1958, 251 F.2d 188, 198; Congress Bldg. Corp. v. Loew's, Inc., 7 Cir ., 1957, 246 F.2d 587, 596-598; Milwaukee Towne Corp. v. Loew's, Inc ., 7 Cir., 1951, 190 F.2d 561, 568. This evidence is necessary in order to connect the asserted antitrust infractions with the alleged scarcity of supplies. Without such a connection, the Bigelow case does not come into play, for the requisite likelihood that defendants' actions caused plaintiffs' injuries is not sufficiently established to justify use of the Bigelow v. RKO Pictures, Inc., supra, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, inference.
 
 
 27
 First, regarding the contract with Apex above referred to: Here, as elsewhere, the plaintiffs should have produced enough evidence to warrant a jury finding that defendants refused to sell to them had dried up other sources of raw materials.
 
 
 28
 The contract between Apex and Brignoud was executed on July 1, 1938, but it was not until the latter part of 1940 that Apex was actually ready to manufacture ferro-vanadium. Between the date of the execution of the contract and April, 1940, Apex was busy seeking technical assistance from Brignoud, a task made exceedingly difficult by the growing Nazi belligerence on the other side of the ocean. This assistance was needed to determine how much aluminum should be used in the alumino-thermic method of vanadium reduction; in other words, the amount of aluminum which, when used in the smelting process, would produce the best recovery of metallic vanadium from oxide. During this experimental period plaintiffs made their first requests for the purchase of raw materials from the defendants.
 
 
 29
 In May, 1939, and again in July and October, 1939, the plaintiff Henry J. Leir, through the Continental Ore Corporation, sought to purchase from defendant Vanadium Corporation of America certain quantities of oxide. Although these various efforts were turned down by that defendant, it is clearly in evidence that during July and August, 1939, another defendant, Electro Metallurgical Sales Corporation, a wholly owned subsidiary of defendant Union Carbide, sold to the plaintiffs 16,000 pounds of oxide. In 1939 Apex was not ready to begin making ferro-vanadium and so did not call for any oxide from Continental. The oxide which plaintiffs acquired in 1939 was sold either on the export market or to non-associated buyers in the United States, It is clear that the alleged lack of oxide during 1939 could have no bearing on the ultimate unsatisfactory outcome of the Apex agreement. What Continental wanted in 1939 was oxide to sell abroad at export prices, not oxide to be delivered to Apex for its ferro-vanadium plant, which could not use it yet.
 
 
 30
 In 1940 the story is much the same. In March Apex did make one approach to Vanadium Corporation of America seeking to buy oxide. Vanadium replied that it had no material to offer Apex at that time. Even so, during the period between September and December, 1940, Apex having first begun in August of that year to produce ferro-vanadium, Continental sold 28,000 pounds of vanadium oxide to others than Apex, which it would certainly not have done had there been a shortage either at that time or to be anticipated in the near future. If such a shortage did exist, it is hard to understand why Apex turned down proffered arrangements with the Blanding mine or with Morrison, both of which could have furnished Apex a considerable quantity of oxide. We cannot by any stretch of the imagination come to the conclusion that the refusal of Vanadium Corporation of America to sell oxide to Apex in March, 1940, contributed to a shortage of supplies at its plant.
 
 
 31
 Nor was the situation much different during 1941. We note that during that year nobody on the plaintiff's side made any offer to buy oxide from defendants. Rather, plaintiffs wrote to defendants seeking from them offers for sale. The last of these letters was written in June, 1941, to defendant Electro Metallurgical Sales Corporation, which failed to answer. It is also in evidence that during 1941 Continental continued the practice of selling oxide indiscriminately.
 
 
 32
 Though no overtures were made to any defendant during 1942 concerning the possible purchase of oxide or ore, it is in evidence that an Apex supplier, Nisley & Wilson, sold 10,000 pounds of oxide to Vanadium Corporation of America in February of that year because Apex was unable to take that shipment owing to a fire in its ferro department.
 
 
 33
 It was not until June, 1942, that Apex canceled its joint venture arrangement with Brignoud allegedly because of the shortage of oxide resulting from plaintiffs' inability to buy supplies from defendants and from defendants' action in preventing Apex from obtaining raw materials from other producers. As noted previously, when rejections by defendants to deal with the plaintiff's are the crux of treble damage actions under the antitrust laws, it is clearly required that the plaintiffs must show that they offered to buy and that the defendants did not sell to them. Even assuming that the failure to make offers to sell in response to plaintiffs' inquiries amounted to a refusal to deal, the last request was made a year before the alleged lack of supplies is claimed to have caused Apex to end its relationship with the plaintiffs. We hold, under the cases cited at pages 90, 91, supra, that the failure of Apex or of Continental to try to buy oxide from the defendants during the final and most critical period in the life of the Apex contract made it impossible for the jury to find that defendants' refusals to deal caused Apex to terminate the arrangement with Brignoud. In regard to the Apex vanture, the judgment below is affirmed.
 
 
 34
 We come now to the plaintiff's efforts to market the Van-Ex compound. Some Van-Ex had been made by Apex before relations with Brignoud finally came to an end in July, 1942. But most of this product was manufactured by Continental in rented premises in Long Island City, New York. According to the allegations of the complaint, the sales of Van-Ex were completely stopped in 1944 for the reason that, because of the defendants' wrongdoing, continental was never able to secure sufficient supplies of raw materials to stay in business. The defendants contended that the manufacture of Van-Ex really stopped in 1943, when Continental sold its pebble mill .
 
 
 35
 The complaint itself is somewhat confusing as to why the Van-Ex business fell off. One paragraph states that the cause of this disaster was the inability of the plaintiffs to secure raw materials through defendants' wrongful acts. Another paragraph asserts that the plaintiffs were shouldered out of the vanadium field, and specifically out of Van-Ex, by defendants' interference with Continental's primary customer for Van-Ex, Atlas Steel, Ltd., of Canada. Defendants are accused of preventing Atlas from securing Van-Ex from Continental. It seems obvious that, if lack of supplies was really the cause of Continental's undoing with regard to Van-Ex, the loss of Atlas as a customer would become irrelevant, for the absence of customers cannot hury a seller who has nothing to sell. On the other hand, if the defection of Atlas was the cause of Van-Ex's demise, the alleged lack of supplies could have had no relevance, for an abundance of goods is of no use to a seller who lacks customers.
 
 
 36
 As to the lack of supplies needed to produce Van-Ex, the plaintiffs once again have the burden of introducing sufficient evidence to warrant the inference that they were unable to obtain oxide from the defendants or from anybody else.
 
 
 37
 The Van-Ex venture must be viewed against the background of wartime regulations and procedures. Metals Reserve Company (hereinafter MRC) was formed by the United States Government in the early months of 1942 to insure that vanadium for the war effort would be readily available when needed. MRC named defendant United States Vanadium Corporation its agent to carry out the appointed task. MRC and United States Vanadium Corporation had three plants at their disposal for milling oxide from ore, one run by the latter at Durango, Colorado, one by Vanadium Corporation of America at Monticello, Utah, and, toward the end of 1942, the Nisley & Wilson mill at Gateway, Colorado. These three plants processed ore furnished by United States Vanadium Corporation as agent for MRC, and the oxide produced was turned over to MRC for a fee or 'toll' on each pound.
 
 
 38
 The oxide accumulated by MRC in this manner was then sold to private interests, provided the prospective buyer could receive an allocation from the War Production Board. There is no evidence that Continental had any trouble obtaining such allocations. By the end of 1943 MRC to all intents and purposes had stopped functioning. At that time the Manhattan Project, designed to make the first atomic bomb, began operations. Since uranium comes from the same ore as vanadium, control over vanadium ore was assumed by the Manhattan Project. So far, however, as can be inferred from the record, the manipulations by the Manhattan Project and by its agent, Union Mines Development Company, a wholy owned subsidiary of defendant Union Carbide, did not come into play until after the Van-Ex project had come to an unsuccessful close.
 
 
 39
 In March, 1943, Continental was granted an allocation for 20,000 pounds of oxide from the War Production Board. MRC supplied 10,000 pounds and the balance was purchased from the defendant Electro Metallurgical Sales Corporation. In making this purchase from Electro, Continental squabbled somewhat over the price but eventually the sale was made at the price offered by Continental.
 
 
 40
 Later in the same year Continental asked defendants Electro Metallurgical Sales Corporation and Vanadium Corporation of America for contracts under which it could buy from them a certain amount of oxide each month over a prolonged period, but the requests were turned down. Again, we must assume that the denial of these requests for contracts amounted to a refusal to deal with the plaintiffs.
 
 
 41
 None the less, appellants failed to show that defendants prevented them from buying raw materials from an independent supplier, namely, Nisley & Wilson. Late in 1942, at the beginning of that firm's toll agreement with MRC, some of its production was earmarked and sent to Continental through MRC. These shipments apparently stopped early in 1943. In the spring of that year MRC entered into a contract with Continental under which the production of Nisley & Wilson, or a part of it, would be shipped to Continental from time to time. In June 17,000 pounds of oxide were ready, but Continental dis not wish to buy for the reason that the oxide was in lumps and Continental needed material more finely ground. Continental had bought these lumps from Nisley & Wilson in the fall of 1942 but did not want them in the summer of 1943. This may have been because Continental had sold the pebble mill which it had begun to operate in Long Island City in 1942. Moreover, because in the summer of 1943 Nisley & Wilson could not have produced oxide in forms smaller than the lumps unacceptable by Continental, the latter conceled its contract with MRC.
 
 
 42
 In October, 1943, Nisley & Wilson foresaw the end of its toll agreement with MRC and installed a flaking machine. It could now produce oxide in flakes rather than in lumps. Continental was advised of the new acquisition and a sample of oxide in the new form was submitted. Continental replied that the flakes were just what the doctor ordered, but made no effort to secure Nisley & Wilson's product. Plaintiffs' witness Martin Wolf testified that this was because Continental did not know that the toll agreement was about to expire and thought that it would not be able to get anything from MRC which, says Continental, was controlled by its agent United States Vanadium Corporation. Nisley & Wilson shut down in January, 1944. It had on hand a stockpile of about 300,000 pounds of oxide which it tried to sell to Continental in the spring of 1944. Again Continental refused to buy.
 
 
 43
 We think this failure to deal with Nisley & Wilson during the Van-Ex period precludes Continental from arguing that defendants prevented the acquisition of raw materials at that time. As to Apex, appellants failed to show their inability to get oxide from defendants. With regard to Van-Ex, they failed to show that it was impossible for them to obtain supplies from an independent producer.
 
 
 44
 As to the alternative allegation, that the loss of the Van-Ex business was caused by the defendants' interference with Canadian buyers, principally Atlas Steels, Ltd., we cannot ignore the fact that Electro Metallurgical Company of Canada, Ltd., had been appointed by the Canadian Government to act as its agent in purchasing Van-Ex for Canadian steel makers. The Canadian Government established a regulation under which no vanadium oxide (including Van-Ex) could be imported into Canada by anybody other than its agent, and Electro Metallurgical Company of Canada, Ltd., refused to purchase Van-Ex from the plaintiffs. Thus, even if we assume that Electro Metallurgical Company of Canada, Ltd., acted for the purpose of entrenching the monopoly position of the defendants in the United States, it was acting as an arm of the Canadian Government, and we do not see how such efforts as appellants claim defendants took to persuade and influence the Canadian Government through its agent are within the purview of the Sherman Act. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 81 S.Ct. 523, 5 L.Ed.2d 464.
 
 
 45
 We now refer briefly to the two remaining allegations of the complaint designed to show that the defendants' illegal acts caused a failure of the plaintiffs to compete successfully in the ferro-vanadium field.
 
 
 46
 During 1943, by threats of reprisals made by one M.D. Arrouet, defendants allegedly forced the termination of contractual negotiations between Climax Molybdenum Corporation and the plaintiffs. The trial judge excluded all evidence dealing with the alleged threats of reprisal; therefore we look to appellants' offer of proof to determine what the story was. Appellants offered to demonstrate that Mr. Arrouet was a highly placed representative of defendants Union Carbide group. It is admitted that he was not an officer of any of the defendants, but it is alleged that his threats of reprisals ought to bind Union Carbide and Electro Metallurgical Company. Appellants' offer of proof would show that Arrouet threatened that if Climax undertook the manufacture of ferro-vanadium for Continental, the defendants would enter the industry as a reprisal against Climax.
 
 
 47
 For present purposes we shall assume that Arrouet said what appellants say he said, and we shall also assume that his statement is to be considered the statement of those defendants in the Union Carbide group. The difficulty with appellants' position in this regard is that the record contains no evidence of the nature of the alleged pending negotiations with Climax. There had been, in February, 1943, an earlier arrangement between Continental and Climax, which it appears was completed. By the end of April, 1943, Continental had shipped the agreed poundage of vanadium oxide to Climax, and Climax had converted this material in accordance with its part of the bargain. This earlier transaction stands alone in the record as the only connection between Climax and Continental. Thus even if Continental and Climax were threatened with reprisals. the evidence does not reveal the result of such threats. On the basis of the evidence in the case, the threat of reprisal appears to be one directed against a corporation with which Continental had no business, since the nature and existence of the alleged 'pending negotiations' are not shown by the record. Appellants have thus failed to show any injury resulting from the alleged threats. There must be an injury, together with a wrong and a causal connection between the two, before liability can result.
 
 
 48
 The remaining instance given in the record is the so-called Imperial venture. On January 4, 1944, Continental Ore Corporation and Imperial Paper & Color Corporation, incorporated in New York, entered into a contract calling for the manufacture of vanadium products. Continental was appointed the exclusive sales agent for these products. Imperial was to pay Continental a commission on all sales made. Imperial was also to install the necessary equipment and give Continental the first opportunity to supply Imperial's total requirements for raw materials. Imperial had some raw materials of its own as by-products of its other business. The Continental-Imperial contract was made contingent upon the decision of Imperial to manufacture vanadium from other raw materials than its chromite by-products. If Imperial should decide not to enter this new field of production, the contract was to become null and void.
 
 
 49
 This is exactly what transpired. In December, 1944, Imperial wrote Continental that it was not yet willing to begin the manufacture of ferro-vanadium as called for in the contract between them. It is clear from this letter that Imperial was worried over the sources of supply of vanadium-bearing raw materials. Similar latters from Imperial to Continental were written on April 9, April 13, and May 11, 1945. Sometime during 1945 Imperial decided not to go into the ferro-vanadium venture with Continental and chose to exercise its right under the contract to call the agreement off. The arrangement never got started. Imperial did not install the necessary equipment and no ferro-vanadium was produced.
 
 
 50
 The various communications from Imperial to Continental show clearly that Imperial was dissuaded from entering this field because of the lack of sources of raw material. It is the appellants' position that they could not get a steady, uniform supply of raw materials because of defendants' alleged antitrust infractions. There is a great deal of evidence showing that various sources of vanadium other than vanadium oxide mined on the Colorado plateau were available to Continental during the life of the Imperial contract. These included lead vanadate from Africa, vanadium ash from Peru, flue dust from ocean-going vessels burning certain Venezuelan and Mexican oils, and something called cuprodescloizite ores. Mr. Wolf, the vice-president of Continental, testified that it would be almost impossible to produce vanadium from these raw materials unless they could be gotten in a steady and uniform manner . Be that as it may, the evidence in regard to the period of the Imperial venture shows the failure on the part of appellants to offer to buy raw materials from the defendants. As we have observed in regard to the Van-Ex venture, both Electro Metallurgical Sales Corporation and Vanadium Corporation of America turned down requirements contracts with Continental late in 1943. At this time the supplies of Nisley & Wilson were available to Continental and were not procured from that firm. The Imperial contract was entered into in January, 1944, and canceled sometime in 1945. Yet from the end of 1943 until 1946, when Electro Metallurgical Sales Corporation gave Continental a requirements contract for vanadium oxide, appellants made no move to obtain the allegedly necessary steady and uniform source of supply from any of the defendants. This is much like the Apex situation except that here there were no offers to buy during the entire life of Continental's arrangement with Imperial. Surely Continental cannot complain that the defendants did it wrong when it cannot show that it sought to alleviate its situation by seeking supplies from the defendants at any time during the life of the Imperial venture.
 
 
 51
 A judgment will be entered affirming the judgment of the District Court.