[No. 150-3.    Division Three.    December 22, 1970.]

JERRY L. JONES, *Appellant,* v. THEODORE J. LEON *et al.,*
*Respondents.*

*Hugh B. Horton* (of *Horton, Wilkins & Horton*) and *J. Murray Kleist,* for appellant.

*Rembert Ryals, Dean W. Loney* and *Diehl R. Rettig* (of *Loney, Westland & Raekes*), for respondents.

EVANS, C. J.—Appellant Jerry Jones brought an action against respondents Theodore J. Leon and Marie Leon, husband and wife, d/b/a Leon's Cafe, and the defendant Glynn Bird, seeking damages for personal injuries received by appellant while a patron in the cocktail lounge of the restaurant owned by respondents. The case was tried to a jury. At the conclusion of all testimony respondents challenged the sufficiency of the evidence and moved for a directed verdict, which was denied by the court. The jury, by its verdict, found for respondents.

At the time of hearing appellant's motion for a new trial or in the alternative for judgment n.o.v., the trial court found reversible error in one of its instructions to the jury, but instead of granting a new trial on appellant's motion, reconsidered its previous denial of respondents' motion for a directed verdict, and determined that it should have been granted. For this reason the court denied appellant's motion for a new trial or in the alternative for judgment n.o.v. and entered judgment on a directed verdict.[1]

---

[1] The procedure followed and the reasons for the trial court's ruling can best be understood from the following colloquy which occurred at the time of the hearing on appellant's motion for a new trial or in the alternative for judgment n.o.v.:

The Court: I have given this case a good deal of thought. Perhaps the Court was somewhat overwhelmed by the seriousness of the injuries.

The primary thought of the Court was to let the matter conclude and let the jury determine it and then have the matter finally disposed of on appeal, assuming it went up on appeal; but quite candidly throughout the course of the trial and in considering it prior to submission, the Court felt the matter should have been removed from the jury.

Appellant first contends there was error in the manner in which the verdict was directed. He argues that since the case had been submitted to the jury upon the court's instructions, and a verdict had already been rendered in

The Court felt that the plaintiff did not establish a cause of action.

. . .

[I]n this Court's judgment, had the plaintiff recovered a verdict I would have granted a judgment notwithstanding the verdict, and I followed this procedure just with the idea of letting the final appeal finalize the rights of the parties rather than going through this again.

. . .

I am ruling that the instruction as given, combined with the argument, the improper argument of Mr. Loney, was error; however, I am not even sure of the nature of the order in this instance, but I would rule as a matter of law that the matter should not have been submitted to the jury, and grant the defendant's motion.

I think that would then require the Supreme Court assuming I am wrong on my granting the motion, to likewise rule on my granting a new trial on the basis of the error committed.

. . .

Mr. Raekes: Would a judgment on the verdict be entered at this time?

The Court: I have never done this before.

Mr. Horton: I don't think you could, your Honor. I think you would have to put it in separately.

The Court: I don't think it is on the verdict. I think I am backing up and granting your motion.

Mr. Horton: I would think so, yes.

The Court: And then if that motion is improperly granted the Supreme Court will go on and consider whether I am in error in granting a new trial on the basis of error committed during the course of the giving of Instruction No. 16, particularly combined with the argument.

. . .

Mr. Raekes: You will be granting our motion to dismiss at the end of the whole trial?

The Court: I would suggest that you brief this out to keep me proper in my procedure. I have never done this before, and I am sure there must be a way that I can accomplish what I have in mind.

I think that in a case as serious as this was, that the court should not act abruptly, and very candidly during the course of the instructions I had this feeling that I should have granted the motion but I wanted the matter set up so that it could be threshed out thoroughly on one appeal, and I still think it is a correct procedure.

favor of respondents, a directed verdict for respondents was procedurally impossible. In other words, once the case went to the jury and a verdict was rendered, it was too late to direct the jury to do anything. While this argument is unassailable from a technical viewpoint, it does not reach the basic and ultimate issue before this court. As we view the problem presented, the issue on appeal is whether this court has the authority to affirm the judgment on the ground that respondents' motion for directed verdict made at the conclusion of all the evidence should have been granted.

No Washington case has been found directly bearing upon this issue. However, in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 289 F.2d 86 (9th Cir. 1961) it was held that where a motion for directed verdict was improperly denied, but the verdict was in accord with the motion, the appellate court could affirm the judgment on the ground the motion should have been granted. In arriving at this conclusion it was noted that in such a situation the party prevailing in the trial court, having received a favorable jury verdict, would not have offered a motion for judgment n.o.v. 5 Moore's Federal Practice, ¶ 50.12 (2d ed. 1969). The rationale of this statement is not dependent upon a statute or court rule. As the court stated in *Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* at 89:

> An appellate court reviews judgments, not the reasons which may be given in their support. It is only common sense that if, on the record before us, we determine that the judgment is correct, it should be affirmed, regardless of the correctness of the reasons which may be given to support it. Suppose that the trial judge had decided to direct a verdict for the defendants. He would, in that event, have entered a judgment to the same effect as the one under review. If we conclude that the trial judge should have granted defendants' motion for a directed verdict, we should affirm the judgment as rendered, whatever errors appellants may convince us were made by the judge during the trial.

If the ultimate decision of this court is to find that, as a

matter of law, the appellant could not establish facts sufficient to entitle him to relief, but remand the case because of the manner in which the verdict was entered, a needless retrial would result and both parties would suffer an injustice at the hands of technicalities.

We believe the rationale of *Continental Ore Co. v. Union Carbide & Carbon Corp., supra,* is correct and should be applied in those instances where, as here, the procedure followed by the trial court does not prejudice the appellant upon his appeal.

Appellant, however, contends that regardless of the procedure followed, the court erred in directing a verdict as a matter of law. As stated in *Kellerher v. Porter,* 29 Wn.2d 650, 655-656, 189 P.2d 223 (1948):

> A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the evidence of the party against whom the challenge or motion is made and all inferences that reasonably can be drawn from such evidence, and requires that the evidence be interpreted most strongly against the challenger or movant party and in the light most favorable to the opposing party. *Billingsley v. Rovig-Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265, and cases therein cited; *Fiskaa v. Miller,* 27 Wn. (2d) 242, 177 P. (2d) 707.

Considering the evidence in the light most favorable to appellant, the facts, in chronological order, are as follows: Vicki Binder and Glynn Bird began going together early in January of 1968. In the latter part of the following month while they were in respondents' establishment, they became involved in an argument which culminated in Bird slapping Vicki in the mouth with sufficient force to cause her lip to bleed. Employees of respondents witnessed this incident and related it to the respondent Mrs. Leon. Approximately 2 weeks later, on the morning of March 6, Vicki drove Bird in his car to the Desert Inn, where he was employed as a bartender. About 5 p.m. that evening Bird received a note from Vicki, together with the keys to his car and some money belonging to him. In the note Vicki

told Bird she no longer wished to continue their relationship. The effect of this news was overwhelming. Bird immediately began, and continued without interruption, to drink 100-proof bourbon and 7-Up for the next 4 hours, until he was finally refused service by the Desert Inn. (His statement that he was so intoxicated he remembered nothing of what later happened is not disputed.) While Bird was thus brooding over the breakup of his romance, Vicki went to Leon's restaurant, where she had worked as a part-time barmaid and was also a frequent customer. Shortly after entering respondents' establishment, and while in the ladies restroom, Vicki told Tony Redinger, respondents' managing employee, that she had broken up with Bird and that she "imagined" or that Bird "probably" would kill her because at one time he had told her he would kill her if she broke up their relationship. She did not say when this threat was made. Tony Redinger testified she did not take Vicki's remarks seriously because of the fact that Vicki later acted in an unconcerned manner. However, Mrs. Redinger did make a remark to the police that Vicki seemed to know that Bird would carry out his threat to kill her. In any event, Vicki remained at Leon's Cafe and joined a group of 5 to 8 people in respondents' cocktail lounge. When Tony Redinger went to the table where Vicki was seated Vicki and her friends were "joking and having a good time". At that time Vicki requested Tony Redinger to call the police if they saw Bird. The time when this conversation took place could not be pinpointed, but was shortly before the orchestra started playing, which was usually at 9:30 p.m. About 10 p.m. appellant Jerry Jones, a patron of respondents' establishment, asked Vicki for a dance. They were on the dance floor when Bird came in through the back door of the restaurant. That entrance was on the ground level and was used almost exclusively by deliverymen during the day. The dance floor and cocktail bar were on a lower level, and when witnesses in the dance hall area first saw Bird, all testified he did not appear to be drunk and acted calm, cool and collected, although, as stated, it is

undisputed that he was, in fact, highly intoxicated. Bird, immediately upon entering the dance hall area, approached Jones and Vicki, who were dancing, put his hand on Jones' shoulder and said, "Shove off from here or I'll kill you." Whereupon Vicki said, "You don't have to leave, Jerry." Bird then said, "I mean it, shove off or I'm going to kill you." Jones did not know Bird had a gun and said, "Have at it." Whereupon Bird pulled a gun from under his coat, shoved it under Jones' arm and pulled the trigger. From 15 to 20 seconds elapsed from the time Bird confronted Jones on the dance floor until he was shot. Appellant Jones suffered serious injuries which left him permanently disabled.

It is appellant's contention that, based upon information possessed by respondents as to the stormy relationship between Vicki and Bird, the harm sustained by Jerry Jones fell within the general field of danger to respondents' patrons, which was or should have been foreseen by respondents. Appellant concedes there was nothing respondents could reasonably have done to prevent the shooting once Bird entered the premises and started onto the dance floor toward Vicki and Jones. Nevertheless, appellant contends respondents had a duty to either (1) prevent Bird from entering the premises, or (2) require Vicki to leave the premises.

The general rule is that a tavern owner has the duty to protect his patrons from the hands of third persons:

> This court, in common with courts of other jurisdictions, has accepted and adhered to the rule that the keeper of an establishment wherein intoxicating liquors are dispensed, while not an insurer of the safety of his patrons, owes the duty to his patrons to exercise reasonable care and vigilance to protect them from reasonably foreseeable injury, mistreatment or annoyance at the hands of other patrons.

*Waldron v. Hammond,* 71 Wn.2d 361, 363, 428 P.2d 589 (1967).

Since appellant's action is founded on negligence, he must establish the following elements:

Plaintiff's evidence must demonstrate that (1) there is a statutory or common-law rule that imposes a *duty* upon defendant to refrain from the complained-of conduct and that is designed to protect the plaintiff against harm of the general type; (2) the defendant's conduct violated the duty; and (3) there was a sufficiently close, actual, causal connection between defendant's conduct and the actual damage suffered by plaintiff.

*Rikstad v. Holmberg,* 76 Wn.2d 265, 268, 456 P.2d 355 (1969).

■■ In determining the scope of the duty owed by respondents, the hazards reasonably perceived are controlling. *Rikstad v. Holmberg, supra.* If the hazards are not foreseeable, the respondents' failure to protect appellant from the particular harm is not negligent conduct.

An essential of actionable negligence is the breach of a duty to the person injured. *Lewis v. Scott,* 54 Wn. (2d) 851, 341 P. (2d) 488 (1959). The duty to use care to avoid injury to others arises from the foreseeability of the risk created. *Leek v. Tacoma Baseball Club,* 38 Wn. (2d) 362, 229 P. (2d) 329 (1951); *Burr v. Clark,* 30 Wn. (2d) 149, 190 P. (2d) 769 (1948). It follows that, if the conduct of the actor does not involve an unreasonable risk of harm to the person injured, he owes no duty to that person and, therefore, there is no actionable negligence.

*Rose v. Nevitt,* 56 Wn.2d 882, 885, 355 P.2d 776 (1960).[2] The

---

[2]The court notes the following language in *Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 405, 451 P.2d 669 (1969), a case involving many of the same issues as are presently before the court:

While it is undoubtedly true that, as the plaintiff urges, if Streeter had been required to leave the tavern before the plaintiff entered, the assault would not have occurred. However, this fact alone does not render the failure to remove him a proximate or legal cause of the plaintiff's injuries. *In order for it to be a cause in that sense, the harm which the plaintiff suffered, or harm of that type, must have been foreseeable.* (Italics ours.)

However, the question of whether foreseeability is pertinent to proximate cause was later restated by the Supreme Court in *Rikstad v. Holmberg,* 76 Wn.2d 265, 268, 456 P.2d 355 (1969), as follows:

The better considered authorities do not regard foreseeability as the handmaiden of proximate cause. To connect them leads to too many false premises and confusing conclusions. Foreseeability is, rather, one of the elements of negligence; it is more appropriately at-

duty to use ordinary care, therefore, is limited by the foreseeable range of danger. *Wells v. Vancouver*, 77 Wn.2d 800, 467 P.2d 292 (1970). If reasonable minds cannot differ as to the extent of the duty, as determined by foreseeability, it becomes a question of law for the court. *Rose v. Nevitt, supra.*

The rule to be applied in testing foreseeability is stated in *Adams v. State*, 71 Wn.2d 414, 422, 429 P.2d 109 (1967), as follows:

It is well established that, on the question of foreseeability, the pertinent inquiry is not whether the actual harm sustained by Mrs. Adams was of a particular kind which was expectable, but whether the actual harm fell within a general field of danger which should have been anticipated. *Fleming v. Seattle*, 45 Wn.2d 477, 275 P.2d 904 (1954); *McLeod v. Grant Cy. School Dist.*, 42 Wn.2d 316, 255 P.2d 360 (1953); *Berglund v. Spokane Cy.*, 4 Wn.2d 309, 103 P.2d 355 (1940).

The test to be applied in determining the foreseeability of intervening acts of a third person is whether such occurrences are so highly extraordinary or improbable as to be wholly beyond the range of expectability. *Berglund v. Spokane County*, 4 Wn.2d 309, 103 P.2d 355 (1940); *McLeod v. Grant County School Dist. 128*, 42 Wn.2d 316, 255 P.2d 360 (1953). In other words, as the court stated in *Rikstad v. Holmberg, supra*, at 269:

It is not, . . . the unusualness of the act that resulted in injury to plaintiff that is the test of foreseeability, but whether the result of the act is within the ambit of the hazards covered by the duty imposed upon defendant.

In support of appellant's contention that the actions of Bird fell within the general ambit of hazards which should have been anticipated by respondents, appellant first argues that, based upon the slapping incident which occurred 2

tached to the issues whether defendant owed plaintiff a duty, and, if so, whether the duty imposed by the risk embraces that conduct which resulted in injury to plaintiff.

This court, therefore, proceeds in its analysis of this case upon the basis that foreseeability determines the duty owed by respondents.

weeks prior to the shooting, respondents had notice that Bird was a person of violent temper. However, the term "violent temper" is not precise, but one of degree. We do not believe it can be inferred from this incident that Bird's temper was so violent and uncontrollable that it was reasonably foreseeable to the respondents that he would use a gun under similar circumstances. There is no evidence, nor inference from evidence, that respondents had knowledge of any propensity of Bird to use a gun.

Appellant further argues, however, that respondents' knowledge of Bird's violent temper, when coupled with Vicki's statement that he would probably kill her, or had threatened to kill her, and her request to call the police if they saw him, brought the subsequent actions of Bird within the realm of reasonable foreseeability. This contention requires consideration, not only of what respondents knew but what they did not know about Glynn Bird. They had no personal knowledge of a threat being made—only what Vicki told them. Vicki did not tell them the circumstances under which the threat was made, nor when it was made, particularly in relation to the written announcement of the breakup in their relationship. Neither party called Vicki as a witness. If such a threat was made it was made at some time before Bird received her note, and not as a result of it, since there is no evidence Vicki saw him after he received the note at 5 p.m. on the date in question. She did not know nor tell respondents that Bird was then looking for her, or that she expected him to come to respondents' establishment that night. They did not know where Bird was at the time, nor that he had been drinking heavily that evening in another cocktail bar. In contrast to the usual lawsuit of this nature, respondents had not seen nor had they served Bird any intoxicating liquor that day. This, no doubt, explains why, according to all witnesses, Vicki appeared to be unconcerned and enjoying herself. From all appearances Vicki was not taking Bird's threat seriously, and the sole information respondents possessed concerning that threat came from Vicki. Appellant, nevertheless, as-

serts that upon learning of Bird's threat respondents had the duty to immediately—or at least within the hour—take preventive measures, to wit, require Vicki to leave the premises, or post guards to prevent the entry of Glynn Bird. Yet, the likelihood that Bird would enter the respondents' establishment that night, the next day, any time within the next week, or at all, was a matter of pure speculation.

Viewing the evidence in the light most favorable to appellant, we are compelled, as was the trial court, to hold as a matter of law that the criminal act of Bird was so highly extraordinary or improbable as to be wholly beyond the range of expectability, and that the result of that act is not within the ambit of hazards covered by the duty imposed upon respondents.

Appellant also contends respondents had a duty to employ someone to prevent disreputable persons from entering their establishment. This contention is based upon evidence that employees of respondents had called the police 60 times in the 2-year period between March 28, 1966 and March 1, 1968 to intervene in disputes at respondents' establishment. The disputes ranged from the failure of customers to pay their bill, to disputes between customers, but did not involve serious violence. Appellant argues that since respondents knew disruptive persons frequented their place of business, they had a duty to exclude such persons from entering and, if a guard was placed at the entrances, Glynn Bird would have been excluded. We find no merit to this contention. It appears from the record that respondents' establishment was the only cocktail bar in the Tri-Cities area open after the usual 2 a.m. closing hour, and that a great majority of the disturbances requiring intervention by the police during the 2-year period above mentioned, in addition to being minor in nature, occurred after 2 a.m. Therefore, if a duty to guard the entrances existed because of past history, that duty would arise after 2 a.m., not 10 p.m. when Bird made his entrance.

We find no merit to appellant's further contention that respondents were negligent as a matter of law for a violation of Title II, section 27(a) of the Revised Rules and Regulations of the Washington State Liquor Control Board, which provides:

No licensee shall . . . permit any disorderly, boisterous or intoxicated person to be [on the licensed premises] . . .

The evidence is undisputed that during the time Glynn Bird was in respondents' establishment he was not boisterous, nor did he give any indication that he was intoxicated. On the contrary, all witnesses, including appellant, testified Bird was at all times "calm, cool and collected". Appellant concedes that when Bird removed the gun from beneath his coat it was too late for respondents to prevent him from shooting.

The trial court did not err in entering judgment upon the directed verdict for respondents. We also find no error in denying appellant's motion for a new trial. Where there is insufficient evidence to take a case to the jury on the question of defendant's negligence, the instructions, given or refused, are of no concern. *Sellman v. Hess*, 15 Wn.2d 310, 130 P.2d 688; *Watson v. Northern Pac. R.R.*, 37 Wn.2d 374, 376, 223 P.2d 1057 (1950).

Judgment affirmed.

GREEN and MUNSON, JJ., concur.

Petition for rehearing denied February 5, 1971.

Review denied by Supreme Court March 2, 1971.