417 So.2d 556 (1982)
Toy KELLY, Janet Kelly, Denise Kelly Boswell, and Mark Kelly, by His Attorney and Next Friend, William Willard
v.
RETZER & RETZER, INC., d/b/a McDonald's Restaurant.
No. 53106.
Supreme Court of Mississippi.
July 21, 1982.
*557 John H. Cocke, William G. Willard, Jr., Holcomb, Dunbar, Connell, Merkel, Tollison & Khayat, Clarksdale, for appellants.
W.O. Luckett, Jr., Luckett, Luckett, Luckett & Thompson, Clarksdale, for appellee.
PER CURIAM.
PATTERSON, Chief Justice, for the Court:
Toy Kelly, father, Janet Kelly, mother, Denise Kelly Boswell, sister, and Mark Kelly, brother, brought suit in the Circuit Court of Coahoma County against Retzer & Retzer, Inc., d/b/a McDonald's Restaurant, for the fatal shooting of Rodney Kelly on McDonald's parking lot. The Kellys sought damages for the loss of their son and brother because of McDonald's alleged negligence in not providing adequate security and safe premises for its patrons. The trial court granted Retzer & Retzer, Inc., (hereinafter McDonald's) a peremptory instruction from which the Kellys appeal to this court.
At approximately 8:30 p.m. on Tuesday, September 25, 1979, a group of teenagers, including Rodney Kelly, gathered on McDonald's parking lot in the City of Clarksdale in Coahoma County. They were asked to leave the premises by the assistant manager because of loitering. One of the group, Lanny Byrd, left McDonald's with a friend and returned for his car at about 9:45 p.m. As he walked to it, a group of black youths approached and one asked for a cigarette. Byrd refused the request and hostile words were exchanged. At this time Kelly pulled into McDonald's parking lot where he was stopped by Byrd who asked if he had a tire tool because the blacks were acting as though they wanted to start trouble. Kelly at first responded negatively but then asked Byrd to wait a minute and pulled into a parking space. As Kelly and his companion, Laura, got out of the car, Kelly asked Laura for the keys to her car which was parked nearby and inquired which key was the one for its trunk. An argument ensued and one of the youths pushed Kelly away from the trunk and threatened to shoot him. Laura testified that Kelly pushed him away and then showed him a scar on his stomach stating that he was not afraid because he had been shot before. Grandberry, the black youth, momentarily waved a pistol and then shot Kelly. Perhaps the scene can best be portrayed by Grandberry's testimony, introduced by the defendant through stipulation as being previously given by him, though its truthfulness was not conceded by the plaintiffs. It was read from the witness stand and follows in pertinent part:
My name is Roosevelt Grandberry, I live at 306 Carolina Street in Clarksdale, Mississippi. I was born on December 31, 1961. On September 25, 1979, I was seventeen years of age... .
*558 On Monday, September 24, 1979, I purchased a .22 caliber pistol for $10.00. On Tuesday, September 25, 1979, my friends, Calvin Harris, James Murphy, Jimmy Jackson, Elbert Clinton and I were walking around town for three hours together. During this time, we visited my girl friend, Linda Smith, who lives over on Paul Edwards. I had the gun with me and showed it to my friends during this time.
After visiting my girl friend, we walked back down Sixth Street to DeSoto where we turned right and walked up to the intersection of Highway 61 and DeSoto, walked over to Mississippi Street and out back through McDonald's back parking lot to reach the alley.
We then walked down the alley behind McDonald's Restaurant going to Seventh Street.
We had no intention of stopping at McDonald's restaurant for any purpose. In fact, my friends and I hardly ever go to McDonald's at all. We were just using the alley as a short cut.
As we were walking down the alley-way behind McDonald's I saw a car in the parking space right next to the alley near the back side of North Mississippi Savings and Loan with two white boys standing beside it.
My friends and I stopped in the alley beside the boy, and I asked one of the white boys for a cigarette. Since he was standing in the parking space right next to the alley, we were not easily visible to anyone inside of McDonald's. He said, "You work and I work. You buy your own damn cigarette." ... And, I said, "Hey man, I just asked you for a cigarette, don't come on me like that." I said, "Just give me a cigarette." He said, "You work and I work, you buy your own damn cigarette." I said, "Wait a minute man, you cannot come off smart on me like that, man. So I'm gonna ask you again. If you don't want to give me no cigarette, just say you ain't giving me no cigarette." He said, "I tell you what. You go ask your mother for one." I said, "No, wait a minute. You don't have to come out on me like that." I asked the other boy, "Ain't this right, man?" The other boy said, "I ain't got nothing to do with it." So, I just went and stood at the end of the dude's car. While we were still talking to the white boy about the cigarette, another white boy and a white girl in a car entered McDonald's parking lot on the other side of the building and drove around onto the alley and around to our side of McDonald's and on past us. The white boy we were talking to flagged the car down and it stopped about twenty feet past us.
The white boy that we were talking to went over to the car and said, "Hey, man, you got a gun or something. I think these niggers out here are trying to do something to me." The dude in the car just nodded his head and said, "Yeah." I had followed close enough behind so I could hear what was going on. So, the dude in the car pulled into a parking space, parked, got out of his car meaning to go to the back of the car.
I said, "Hey, man, you don't have to get this dude over here no gun to hurt me or nothing. I just asked him for a cigarette." At that time I had my hand on his car leaning on it and he said, "Get away from my car, nigger." So, I said, "Hey, man, I just told you, man. You don't have to get no gun." But he had his keys in his hand going to put them in his trunk so I pushed him back. Then he pushed me back. Then he told his girl to get a pistol out of the glove compartment. So, I said, "Hey, bitch, don't get no pistol out of no glove compartment 'cause I have a gun, too. Somebody's going to get shot or hurt or something." So he raised his shirt and showed me where he had been shot before, and said, "I already been shot before. I don't care if I get shot again." Up to this time, I had been alone with him at the back of his car. All the others were still at the other end of the parking lot. But, then, Elbert came over and said, "What's up?" I said, "Nothing, man. This white boy is just talking about getting a gun out of his trunk and shooting me with it. I ain't gonna let him get no gun out of his trunk." Then Elbert and I started backing off. But the white *559 boy kept going closer to the trunk so I pulled out my gun and I shot in the air first. But he kept going closer to the trunk and got ready to put his key in the back of the trunk so I shot him. Then I got scared and ran. I had never seen or heard of the white boys or the white girl before... .
Byrd testified that just prior to the shooting he tried to get the attention of McDonald's manager and assistant who were in the restaurant. The assistant testified that he came to the door where Byrd asked him to call the police because one of the blacks had a gun, and, that he turned to go inside but the shots were fired before he could reach the telephone. The police were called and arrived on the scene within one or two minutes as did an ambulance, but Kelly died soon after the shooting. Byrd stated that twelve to thirteen minutes elapsed from the time he returned to McDonald's to the time of the fatal shooting, and, further testimony estimated Kelly was on McDonald's premises two to four minutes before he was shot.
The plaintiffs introduced into evidence the top portion of 28 police offense reports made between January 1, 1976, and September 24, 1979, when officers received calls concerning various activities at McDonald's and were dispatched to investigate. Nine of these reports dealt with theft or burglary from automobiles in the parking lot. Seven concerned reports of other theft on the premises such as purses, a wallet, a bicycle and a bicycle tire. The other reports included three incidents of vandalism, two assaults, one attempted auto theft, one auto theft, one attempted fraud, an armed robbery in a restroom, one strong armed robbery of a child by a 15 year old boy, one simple assault and one unknown complaint. During the same time interval, January 1, 1976, and September 24, 1979, there were 5,435 offense reports recorded by the Clarksdale Police Department for the entirety of the city.
In addition to the reports, several witnesses gave testimony concerning various incidents in which they were involved on McDonald's premises. Six of these incidents were included in the offense reports. In the other occurrences, the police were not involved or did not make an offense report or McDonald's personnel were not involved.
The plaintiffs also proposed to call an alleged expert criminologist of whom they intended to ask a hypothetical question concerning security measures which should have been undertaken by McDonald's in view of offenses or incidents that had previously transpired at McDonald's. The court was of the opinion the jury could make that determination as well as the proposed witness whereupon a proffer of his testimony was made as follows:
He would say that in his opinion that business needs to undertake security precautions which would include the use of an armed security guard, and that such a device is quite common in this industry, including numerous other McDonald's stores, which use full-time armed security guards for the protection of patrons.
Michael Retzer, President of Retzer & Retzer, Inc., testified that McDonald's policy manual states that certain teenage behavior cannot be permitted, including "groups gathering and standing around," and if such problems develop and cannot be stopped, a security officer should be hired. He further testified that it was the policy of McDonald's for the restaurant manager to check the premises, including restrooms, dining and lobby areas, parking lot and surrounding areas every thirty minutes. Additionally, he stated that in the fall of 1978, and in the early part of 1979, off duty policemen or others were hired to supplement the management team on Friday and Saturday nights because the volume of business doubled at such time and the management team is often very busy inside and unable to make the routine inspections of the outside premises.
William Goff, the assistant manager of the Clarksdale McDonald's testified that it was his duty to physically patrol the premises and that he did so on a regular basis every evening. Goff further testified that if teenagers gathered in the parking lot for *560 two to three minutes, he would go out and ask them to either come in and buy something or leave.
Sandy Stillions, manager of McDonald's in Clarksdale, testified that in the six years that McDonald's had been open, uniformed officers were used as supplemental security on weekends for six to eight months and further, that there were probably no fewer disturbances or fights while the officers were on the premises than when the management teams patrolled the area.
In the first assignment of error, the Kellys contend the trial court erred in granting McDonald's motion for a peremptory instruction. The theory of this case is of course, negligence which requires proof of the duty owed by McDonald's to Rodney Kelly, proof that the duty was breached, proof that the breach caused Kelly's death as well as proof of the elements of damages.
The general rule concerning the duty owed by an owner or occupier of land to his business invitees is stated in J.C. Penney Company v. Sumrall, 318 So.2d 829, 832 (Miss. 1975):
Although the owner of a store to which he invites the public is held to the exercise of reasonable care in maintaining his place of business in a safe condition for the use of his customers, he is not an insurer of their safety. Sears, Roebuck & Co. v. Tisdale, 185 So.2d 916 (Miss. 1966).
Undoubtedly, McDonald's owed its patrons, one of whom was Rodney Kelly, a duty to exercise reasonable care for their safety. The question presented is whether there was a breach of that duty and whether the injury to Rodney Kelly was proximately caused by such breach under the presented facts.
In considering the propriety of the trial court's action in sustaining the motion for a peremptory instruction we need to consider the general rule, which follows:
The rule relating to the propriety of granting a directed verdict or peremptory instruction has been announced many times by this court. We said in Mock v. Natchez Garden Club, 230 Miss. 377, 382, 92 So.2d 562, 563 (1957):
[T]hat if reasonable men might have a difference of opinion as to whether or not the negligence of the actor constituted a substantial factor in bringing about the injury, then the question is for the jury. We have also held repeatedly in cases too numerous to mention that upon a motion for a directed verdict all the facts expressly testified to, and all inferences necessarily and logically to be deduced therefrom, are to be taken as true in favor of the party against whom the motion is asked, and that a case should not be withdrawn from the jury unless the conclusion follows as a matter of law that no recovery can be had upon any view which can be properly taken of the facts which the evidence tends to establish, and further that if more than one reasonable inference can be drawn from the facts the question of negligence is for the jury. (Emphasis added). ([Butler v. Chrestman] 264 So.2d [812] at 815 [(Miss. 1972)]).
318 So.2d at 833.
In considering the facts and all inferences logically deduced therefrom as true in favor of the Kellys, we are of the opinion the trial court did not err in granting the peremptory instruction. In reaching this conclusion we think the appellant failed to prove that McDonald's breached its duty of reasonable care for the safety of their patrons.
The appellants argue this was a question for the jury in view of the previous offenses or incidents which had occurred at McDonald's and that it could be reasonably foreseen that precautionary measures should have been undertaken to prevent an offense of a higher degree with potential tragic consequences for one of its patrons. In our opinion the undisputed evidence reveals that reasonable security measures were undertaken by McDonald's and, moreover, the tragedy was not reasonably foreseeable. If, however, conceded to be foreseeable, as all crimes are generally foreseeable, we would still be unable to opine that *561 McDonald's security measures for the safety of its patrons were unreasonable or could have assured the plaintiffs' decedent reasonable safety when the uncontradicted facts reveal that he intervened in a hostile situation.
The evidence is without dispute that McDonald's did in fact require its assistant manager to patrol the parking lot area every thirty minutes, which the assistant manager testified he did on a regular basis, and, that if teenagers gathered on the premises for two to three minutes, they were advised to come in and buy something or to leave. The record is also uncontradicted that Kelly, who was on the premises from two to four minutes, upon learning that his ultimate assailant, Grandberry, and the other youths wanted to start trouble, voluntarily parked, got out of his car, and asked Laura in the presence of Grandberry for the key to the automobile trunk, ostensibly to obtain some type of a weapon. In addition, Kelly displayed a scar on his abdomen, stating he had been shot before and was not afraid. Moreover, when McDonald's was notified of the hostility between the youths, the assistant manager immediately responded by turning to call the police, but the shots were fired before he was able to reach the telephone. In view of this sudden and spontaneous encounter, coupled with McDonald's notice only seconds prior to the shooting and plaintiffs' decedent's voluntary intervention into the affray, we are of the opinion that McDonald's was not negligent in either failing to assist Kelly at the time of the encounter by not providing an armed security guard or by the assistant manager's failing to interject himself into the affray rather than call the police.
As this is a case of first impression in our state we mention those cases from other jurisdictions which have persuaded us to the above point of view.
In Cook v. Safeway Stores, Inc., 354 A.2d 507 (D.C.App. 1976), the appellant was assaulted in appellee's grocery store when she pursued and seized a stranger who had stolen her wallet. The appellee's motion for a directed verdict was sustained following appellant's opening statement wherein negligence was based upon there being no security guards present on the particular night of the assault and robbery. There was also an offer to prove that the store was located in a high crime area and that similar incidents had previously occurred. In affirming the directed verdict the court found it "apparent that the immediate cause of plaintiff's injury, a rash attempt on the part of a customer physically to restrain a purse snatcher from fleeing from the scene of the crime, was not one which the storekeeper could be expected to anticipate." 354 A.2d at 508-09. The Court further held:
This court is all too familiar through daily police reports of the high incidents throughout the entire city of such crimes as mugging, purse snatching, assault and robbery  a constant hazard to all law abiding persons who use the streets and public places of business. But simply because this hazard exists, it does not follow that the common law of negligence imposes an obligation upon private enterprises to provide armed guards to insure the safety of persons invited to do business with them. 354 A.2d at 509.
The court in Cook also quoted with approval Radloff v. National Food Stores, Inc., 20 Wis.2d 224, 121 N.W.2d 865 (1963):
Everyone can foresee the commission of a crime virtually anywhere and at any time. If foreseeability itself gave rise to duty to provide "police" protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner. 354 A.2d at 509.
In Jones v. Leon, 3 Wash. App. 916, 478 P.2d 778, 781 (1970), the Court of Appeals affirmed a directed verdict in favor of the defendant in a suit for negligence by a patron of a restaurant and bar who was shot in the establishment. Jones is similar to this case in that the would be assailant, Bird, entered the establishment and approached Jones and stated "I mean it, shove *562 off, or I'm going to kill you." Jones not knowing that Bird had a gun stated, "Have at it" whereupon Bird shot Jones. The plaintiff contended that because the police had been called sixty times in the two years preceding the incident, the defendant was under a duty to employ someone to prevent disreputable persons from entering. The court held "as a matter of law that the criminal act of Bird was so highly extraordinary or improbable as to be wholly beyond the range of expectability, and that the result of that act is not within the ambit of hazards covered by the duty imposed upon respondents." 478 P.2d at 784.
In addressing the issue of Kelly's intervention in the affray we again turn to other jurisdictions. In Roberts v. Tiny Tim Thrifty Check, 367 So.2d 64 (La. App. 1979), Roberts was in the defendant's grocery store attempting to place a phone call when two men entered, drew guns, and ordered the cashier and her husband to lie on the floor. The cashier called to Roberts to get off the phone stating one of the men had a gun. The cashier testified that she heard a scuffle and one of the robbers say, "So you want to fight." Roberts was then shot and killed. The judge dismissed the wrongful death suit brought by Roberts' parents concluding that the appellee not only did not breach his duty of care, but that even if he had breached such a duty, "the decedent's own actions in choosing to fight with an armed robber precluded recovery." 367 So.2d at 65.
In affirming the lower court's dismissal the appellate court reiterated the words of the trial court: "[T]o ask this store or any other small business to do more, such as hiring full time armed guards in fear of any potential robbery would make this burden of prevention extremely high and in all likelihood make the cost of running a small business prohibitive." 367 So.2d at 65.
Somewhat similar, in the case presented here, it would seem only conjecture, that security precautions over and above those used by McDonald's would have prevented the fatal shooting. Kelly's voluntary interference into an already hostile situation was an independent intervening cause which could not have been reasonably foreseen or prevented by McDonald's.
In Oliver Bus Lines v. Skaggs, 174 Miss. 201, 210, 164 So. 9, 12 (1935), we stated: "[A]n independent intervening cause is one that could not have been reasonably foreseen by the defendant while exercising due care."
Neither do we think that from the facts before us that McDonald's could have foreseen that Kelly and other youths would choose McDonald's parking lot as their battleground.
In Rosensteil v. Lisdas, 253 Or. 625, 456 P.2d 61 (1969), three persons, while engaged in a fight entered appellee's restaurant, and a patron of the restaurant was severely injured when he attempted to assist one of the injured fighters. In an action by the patron against the restaurant for negligently allowing on the restaurant premises persons known to the defendant as having violent and disorderly propensities, allowing disorderly conduct on the premises, and failing to provide employees to maintain order, the Oregon Court affirmed a judgment in favor of the restaurant. It held:
Even if a restaurant owner has the duty under some circumstances to employ personnel who are capable of keeping order and thus protect his patrons from injury resulting from the foreseeable conduct of his patrons, he is not required to employ such personnel for the contingency that outsiders will elect to use the restaurant rather than the street as their battleground. The fact that the Hale Brothers had previously been in the restaurant gave defendants' employees no warning that they would stir up trouble and suddenly return to burst into the restaurant. It is the responsibility of the public police to quell such disturbances whether they occur on a street or in a restaurant. And even where previously violence has swept in from the streets, we do not think that it should be the duty of a businessman operating a restaurant to risk his own life or employ others to risk theirs in order to protect bystanders who *563 happen to be in the restaurant rather than on the street. That is a function which he should be able to leave to government police. 456 P.2d at 63.
Persuaded, as mentioned, we conclude that the trial court did not err in sustaining the motion for a directed verdict. In so ruling we are not unmindful of the trial court's exclusion of expert testimony that would have been offered by a criminologist. We think he erred in this regard, provided he had been qualified as an expert, but nevertheless are of the opinion the proffer did not touch the question of foreseeability or voluntary intervention leaving the error harmless, in our opinion. Moreover, we are of the opinion the responsibility of enforcing the law is on the government chosen by the people of the area and does not necessarily rest upon the business involved. We therefore affirm.
AFFIRMED.
All Justices concur except PRATHER, J., takes no part.