870 So.2d 1250 (2004)
James G. GIBSON, Individually, Cecelia A. Gibson, Individually, and James G. Gibson and Cecelia A. Gibson d/b/a T.G.'s Washout, Appellants
v.
Jeffery WRIGHT, Individually and as Administrator of the Estate of Jeffery Henderson, Deceased, Appellee.
No. 2002-CA-00640-COA.
Court of Appeals of Mississippi.
April 20, 2004.
*1253 Craig Robert Sessums, Hugh Gillon, Jackson, Brian Austin Hinton, Columbus, attorneys for appellants.
James Ashley Ogden, Jackson, attorney for appellee.
EN BANC.
MYERS, J., for the Court.
¶ 1. Jeffery Henderson was shot during an attempted robbery at T.G.'s Washout[1] in Jackson, Mississippi. Jeffery Wright, individually, and on behalf of the Henderson Estate brought suit for a wrongful death claim arising from his father's death. After a jury trial in the Circuit Court of Hinds County, a verdict was returned against James G. Gibson and Cecelia A. Gibson, individually, and James G. Gibson and Cecelia A. Gibson d/b/a T.G.'s Washout (Gibsons). The Gibsons now appeal raising the following issues:
I. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR SUMMARY JUDGMENT
II. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A DIRECTED VERDICT
III. WHETHER THE TRIAL COURT ERRED IN EXCLUDING THE DEPOSITION TESTIMONY OF ANTHONY BOONE
IV. WHETHER THE TRIAL COURT ERRED IN LIMITING THE EXAMINATION OF ANTHONY BOONE AT TRIAL
V. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN REFUSING TO GIVE APPELLANT'S JURY INSTRUCTION D-21 WITHOUT MODIFICATION

STATEMENT OF FACTS
¶ 2. On February 3, 1998, Jeffery Henderson drove his girlfriend, Mary Coleman, to work. Coleman was an employee of T.G.'s Washout and was scheduled to close the laundromat that night. After dropping Coleman off, Henderson drove to his mother's house in order to pick up some laundry he agreed to wash for her. He returned to T.G.'s Washout and washed his mother's laundry along with some of his own.
*1254 ¶ 3. After Henderson finished the laundry, he helped Coleman clean up the laundromat and prepare to close for the night. While Henderson was sitting in the laundromat's office, a man entered the laundromat through the side door and handed Henderson a note. The note demanded money. Henderson informed the man that there was no money and the man shot Henderson in the chest. The assailant and another individual immediately fled the scene. Henderson died shortly thereafter and two men were charged, convicted, and sentenced for the murder.
¶ 4. Wright brought suit complaining that the Gibsons breached the duty which they owed to Henderson as an invitee. Wright alleged that the Gibsons were negligent in the operation of their business due to a lack of security measures. Wright alleged that this lack of security measures was the proximate cause of Henderson's death.
¶ 5. The Gibsons filed a motion for summary judgment claiming Henderson was, at most, a licensee. The Gibsons argued that the motion should have been granted because there was no proof the Gibsons had willfully and wantonly injured Henderson. The trial judge ruled there was a genuine issue of material fact as to Henderson's status at the time of his death. As a result, the motion for summary judgment was denied.
¶ 6. During discovery, the Gibsons conducted several depositions including that of Anthony Boone. Boone was an accomplice of the gunman, David Young. Wright filed a motion in limine asking the court to exclude Boone's deposition. The trial court granted Wright's motion as to Boone's deposition. The trial court ruled that Wright had no opportunity to crossexamine Boone at his deposition. As a result, the trial court excluded the evidence.
¶ 7. At the close of Wright's evidence, the Gibsons moved for a directed verdict. The motion was denied and the jury ruled in favor of Wright. The Estate of Henderson was awarded $540,000. Wright was awarded $250,000 individually. After the final judgment, the Gibsons moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial. This post-trial motion was denied. Aggrieved by the result, the Gibsons filed the present appeal.

LEGAL ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR SUMMARY JUDGMENT
¶ 8. As to the issue of whether the trial court erred in denying the Gibsons's motion for summary judgment, we hold that the ruling on summary judgment was interlocutory in nature and was subsequently rendered moot by the trial on the merits. Black v. J.I. Case Co., Inc., 22 F.3d 568, 569-70 (5th Cir.1994). In other words, "[o]nce trial begins, summary judgment motions effectively become moot." Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 397 (5th Cir.1995). As a result, we decline to review this issue.
II. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A DIRECTED VERDICT
¶ 9. The standard of review concerning a motion for a directed verdict is well settled. We "will consider the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence." Gatewood v. Sampson, 812 So.2d 212, 219 (¶ 11) (Miss.2002) (citing Steele v. Inn of Vicksburg, Inc., 697 So.2d 373, 376 (Miss.1997)). *1255 If the facts are so overwhelmingly in favor of the appellant that a reasonable juror could not have arrived at a contrary verdict, this Court must reverse and render. Id. On the other hand, if substantial evidence exists in support of the verdict, that is, "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions," then this Court must affirm. Id.
¶ 10. The Gibsons argue the trial court erred in denying their motion for a directed verdict for two reasons. First, the Gibsons argue that although Henderson was initially an invitee he subsequently became a trespasser because he entered the laundromat's office after being told not to do so. Second, the Gibsons argue that although Henderson was initially an invitee he subsequently became a licensee because he had finished washing his own clothes and was helping his girlfriend clean up.
¶ 11. Wright argues the trial court correctly denied the Gibsons's motion for a directed verdict. Wright asserts that the trial testimony established Henderson as an invitee. Wright further asserts that he met all of the necessary elements of a wrongful death claim and that the jury properly ruled in his favor.
¶ 12. A person's status on a landowner's premises dictates the duty involved. Hoffman v. Planters Gin Co., 358 So.2d 1008, 1011 (Miss.1978). "A person is considered an invitee if they enter the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage." Titus v. Williams, 844 So.2d 459, 467 (¶ 29) (Miss.2003). "A landowner owes an invitee the duty to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not in plain and open view." Id.
¶ 13. A licensee enters another's property for his or her own convenience, pleasure or benefit pursuant to the license or implied permission of the owner. Hudson v. Courtesy Motors, Inc., 794 So.2d 999, 1003 (¶ 10) (Miss.2001). A trespasser enters another's property without any right, lawful authority, express or implied invitation, permission, or license. Titus, 844 So.2d at 467 (¶ 29). "A landowner owes a licensee and a trespasser the same duty, to refrain from willfully and wantonly injuring him." Adams v. Fred's Dollar Store of Batesville, 497 So.2d 1097, 1100 (Miss.1986). There is, however, one recognized exception for a licensee, in that ordinary reasonable care is required where the landowner engages in active conduct and the plaintiff's presence is known to him. Id. at 1101. "This exception is not applicable where the licensee is injured as a result of the condition of the premises, or passive negligence." Id.
¶ 14. The Gibsons direct our attention to Lucas v. Buddy Jones Ford Lincoln Mercury, Inc., 518 So.2d 646 (Miss.1988), and ask us to rule in a similar fashion. In Lucas, a mother dropped off the couple's child at her spouse's work. Id. at 647. The father was going to watch the child while the mother went to a doctor's appointment. Id. When the mother returned to pick up the child, she fell on a piece of ice in the defendant's parking lot. Id. The mother sued claiming she was an invitee but the trial court granted the defendant's motion for summary judgment. Id. On appeal, the Mississippi Supreme Court affirmed. Id. at 649.
¶ 15. The court found that Lucas was going to Buddy Jones Ford solely to pick up her son so they could go home. Id. at 647. In her deposition, "Lucas admitted that there was no business purpose in her visit to Buddy Jones Ford and that the *1256 business derived no benefit from her visit." Id. Since the facts were undisputed as to Lucas's status, the Mississippi Supreme Court held that the trial court acted proper in not allowing the jury to consider the question of whether or not Lucas's status was otherwise. Id. at 648.
¶ 16. The Gibsons argue that, like Lucas, Henderson was on the defendant's property solely for his own convenience, pleasure or benefit. We disagree. Henderson's status is distinguishable from Lucas's because there is evidence that Henderson entered T.G.'s Washout in answer to the implied invitation of the Gibsons for their mutual advantage. First, there is uncontradicted evidence that Henderson washed clothes at T.G.'s Washout on the day in question. Henderson did not leave T.G.'s Washout from the time he washed his clothes until the time he was shot. This seems to be the classic example of a business invitee or patron.
¶ 17. Second, there is evidence that the Gibsons accepted the benefit of Henderson being at T.G.'s Washout with Coleman. While it can be said that Henderson benefitted by helping his girlfriend so she could close early, the Gibsons likewise benefitted from having Henderson accompanying Coleman at night. The Gibsons gained an advantage in the form of increased profits and employee safety. With Henderson present at night, Coleman was free to utilize the machines in order to complete customers' orders without having to remain in the office. Coleman also felt safer having Henderson present in the laundromat. More importantly, the Gibsons acknowledged and accepted these benefits.
¶ 18. The classification of an entrant on another's property is a question of law only where the facts are undisputed. Adams, 497 So.2d at 1100. The Gibsons argue that, like Lucas, the facts surrounding Henderson's status are undisputed. We disagree.
¶ 19. The Gibsons argue that neither Henderson's mother nor Coleman could refute the fact that Henderson was told by James Gibson not to go into the office. Apparently, only Henderson could refute that assertion. That would be impossible considering Henderson is deceased. However, this does not render the facts surrounding Henderson's status as undisputed.
¶ 20. There was evidence presented at trial that the Gibsons established a pattern of authorizing Henderson and other patrons access behind the counter to help employees. In addition, there was evidence concerning the integrity of the Gibsons's claim that Henderson was not allowed behind the counter. At trial, Coleman testified regarding a conversation between James Gibson and herself:
Q: What was the nature of that call?
A: You and the other attorney called me and was asking some questions so then I got in touch with Mr. Gibson and I asked him what was going on. And he told me he had been wanting to get in touch with me but he didn't have a phone number.
Q: What else did he say to you?
A: I asked him, well, what do you want me to do. And he said, well just tell them I didn't want him back there behind the counter he wasn't allowed back there and you didn't want him back there and just exaggerate. You know what to do.
Q: Is it your testimony today that Mr. Gibson didn't want him behind the counter either?
A: Now Mr. Gibson told me he was letting him come back there because he wanted him back there to *1257 make it more safer in that neighborhood.
¶ 21. This evidence contradicts not only the fact that Henderson was not allowed in the office, but also the fact that Henderson had been demoted from invitee to licensee. We find that the issue as to Henderson's status was disputed. As a result, it was a question of fact to be determined by the jury.
¶ 22. Wright also presented evidence that the Gibsons had breached their duty to Henderson. In other words, that the Gibsons had failed to keep T.G.'s Washout reasonably safe by failing to provide adequate security measures. At trial, Wright presented evidence as to T.G.'s Washout's lack of lighting above the side entrance and the fact that the side door was left unlocked and open even at night. Wright also presented evidence that other businesses in the immediate vicinity of T.G.'s Washout enacted security measures such as adding lights, installing window bars, and providing security during business hours while T.G.'s Washout did not.
¶ 23. Likewise, Wright presented evidence that Henderson's attack by a third person was reasonably foreseeable. In Lyle v. Mladinich, the Mississippi Supreme Court stated that there were two ways to establish legal causation, or foreseeability, in cases of assault by a third person. Lyle v. Mladinich, 584 So.2d 397, 399 (Miss.1991). "The requisite `cause to anticipate' the assault may arise from (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists [on the premises]...." Lyle, 584 So.2d at 399 (quoting Grisham v. John Q. Long V.F.W. Post No. 4057, Inc., 519 So.2d 413, 416 (Miss.1988)). In addition, evidence of the existence of an atmosphere of violence may include the frequency of criminal activity on the premises in question as well as the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business. Gatewood, 812 So.2d at 220 (¶ 14).
¶ 24. Wright presented evidence that the Gibsons had actual knowledge that an atmosphere of violence existed at T.G.'s Washout. At trial, Wright presented evidence that the Gibsons had previously hired a security officer to watch the laundromat at night but later declined to extend his services.
¶ 25. In addition, Wright tendered John Tisdale as a witness. At the time of the incident, Tisdale was a City of Jackson Police Commander in Precinct Four. Precinct Four encompasses the area in which T.G.'s Washout is located. Tisdale testified as to the frequency of crime at T.G.'s Washout and of other businesses in the area. Tisdale testified that the proximate cause of Henderson's death was the failure to lock the side door.
¶ 26. Finally, Wright tendered Officer Kenneth Goodrum, a sergeant with the City of Jackson Police Department, as a witness. Like Tisdale, Goodrum testified as to the frequency of crime at T.G.'s Washout and other area businesses. Goodrum also testified that he had previously spoken with James Gibson during an anti-crime initiative conducted in Precinct Four. Goodrum testified that he recommended security measures to Gibson. Gibson denied this allegation at trial.
¶ 27. Viewing this evidence in the light most favorable to Wright and giving him the benefit of all favorable inferences that may be reasonably drawn from the evidence, we find that substantial evidence exists to support the verdict. The Gibsons have failed to meet the burden necessary to overturn the jury's verdict. As a result, *1258 we affirm the trial court's denial of the Gibsons's motion for a directed verdict.
III. WHETHER THE TRIAL COURT ERRED IN EXCLUDING THE DEPOSITION TESTIMONY OF ANTHONY BOONE
¶ 28. The standard of review for either the admission or exclusion of evidence is abuse of discretion. Harrison v. McMillan, 828 So.2d 756, 765 (¶ 27) (Miss.2002) (citing Floyd v. City of Crystal Springs, 749 So.2d 110, 113 (Miss.1999)). This Court will not reverse an erroneous admission or exclusion of evidence unless the error adversely affects a substantial right of a party. Id.
¶ 29. At Boone's deposition, the Gibsons's counsel asked Boone questions regarding the attempted robbery. Boone made several allegations that were damaging to Wright. Boone alleged that he knew Henderson and that he used to sell drugs to Henderson. Contrary to Young's testimony, Boone alleged that they were at T.G.'s Washout to collect a drug debt. After these allegations, Boone demanded money before going any further. Counsel informed Boone that they could not pay him for his deposition. Boone then claimed his Fifth Amendment privilege against self-incrimination and refused to answer any more questions. Wright's counsel attempted to question Boone, but Boone refused to answer.
¶ 30. Wright filed a motion in limine asking the court to exclude Boone's deposition from the evidence because he had no opportunity to cross-examine the deponent. Wright argued the deposition was hearsay and did not meet the requirements under Mississippi Rule of Evidence 801(d)(1).
¶ 31. The trial court agreed with Wright and partially granted his motion in limine. The trial judge excluded Boone's deposition for any purpose solely because Wright had no opportunity to cross-examine the deponent. The trial judge also excluded any testimony concerning Henderson's alleged drug use or drug debt. The trial judge stated, however, that the Gibsons were free to question Coleman about allegations of Henderson's drug use and any debt owed to Young or Boone.
¶ 32. On appeal, the Gibsons argue the trial court erred for two reasons. First, the Gibsons argue that, under the Mississippi Rules of Civil Procedure, objections to the admissibility of depositions may only be made "for any reason which would require the exclusion of the evidence if the witness were then present and testifying." M.R.C.P. 32. Second, the Gibsons argue that, assuming Wright did make a valid hearsay objection, Mississippi Rule of Evidence 804(b)(1) provides an exception for former testimony since Boone is unavailable. We disagree.
¶ 33. Boone's deposition would be hearsay because it is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). In addition, Boone's deposition does not meet the exemption requirements under Mississippi Rule of Evidence 801(d)(1). Boone's availability does not change this result. Since Wright could have objected to the deposition as hearsay regardless of whether Boone was present at trial or not, we find the Gibsons's first argument to be without merit.
¶ 34. The Gibsons's second argument fails for similar reasons. Former testimony is admissible as an exception to the hearsay rule "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect *1259 examination." M.R.E. 804(b)(1). In addition, the declarant must be unavailable. Id. The trial judge ruled that Wright had no opportunity to cross-examine Boone. As a result, the deposition fails to meet the requirements under Mississippi Rule of Evidence 804(b)(1). We find that the judge did not abuse his discretion in making that decision.
IV. WHETHER THE TRIAL COURT ERRED IN LIMITING THE EXAMINATION OF ANTHONY BOONE AT TRIAL
¶ 35. The Gibsons requested and were granted a court order allowing Boone to testify in person. Boone was transported from the Wilkinson County Correctional Facility to the Hinds County Courthouse. Boone gave his name and verified that he was serving time for capital murder. Other than that, Boone's answer to every question was, "I plead the fifth." The trial court asked Boone, "[D]o you intend not to answer any questions here today?" Boone replied, "I intend not to answer any." Despite this, the trial judge allowed the Gibsons to ask more questions but Boone refused to answer. The Gibsons unsuccessfully attempted to impeach Boone with his deposition. The trial judge then ended the examination and excused Boone from the witness stand and ordered that he be sent back to jail.
¶ 36. The privilege against self-incrimination is available to witnesses in criminal and civil proceedings. In re Knapp, 536 So.2d 1330, 1334 (Miss.1988). In addition, the person claiming the privilege can be a nonparty witness. Woodham v. State, 779 So.2d 158, 161 (¶ 10) (Miss.2001).
¶ 37. The Gibsons argue they should have been able to ask Boone every question they had prepared. The Gibsons argue that Boone was required to provide the trial court with sufficient information for it to determine whether or not Boone's response would, in fact, incriminate him. The Gibsons further argue they should have been able to impeach Boone with his deposition. The Gibsons direct our attention to Harrell v. Duncan, 593 So.2d 1 (Miss.1991), and ask us to rule in a similar fashion.
¶ 38. We decline because Harrell involved a defendant who invoked his Fifth Amendment privilege to avoid opposing counsel's cross-examination. In the case sub judice, Boone was a non-party witness called by the Gibsons on direct examination. We agree that a party who is testifying in a civil suit must claim his Fifth Amendment privilege on a question by question basis. Knapp, 536 So.2d at 1334. However, the Gibsons can provide no support for the notion that a non-party witness in a civil case has to proceed in the same fashion. As a result, we find the trial judge did not commit reversible error by ending Boone's questioning.
¶ 39. In addition, it was not error for the trial judge to prohibit the Gibsons from impeaching Boone with his own deposition for two reasons. First, the trial judge previously ruled that Boone's deposition was inadmissible for all purposes. Second, once a witness invokes his Fifth Amendment privilege, his silence does not constitute grounds for impeachment. Balfour v. State, 598 So.2d 731, 751 (Miss. 1992). We find the trial court's decision to end Boone's questioning proper.
V. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN REFUSING TO GIVE APPELLANT'S JURY INSTRUCTION D-21 WITHOUT MODIFICATION
¶ 40. When determining whether reversible error lies in the granting or refusal of various jury instructions, the instructions actually given must be read as *1260 a whole to determine whether a jury has been incorrectly instructed. Haggerty v. Foster, 838 So.2d 948, 953(¶ 4) (Miss.2002). When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. Id.
¶ 41. The pertinent portion of jury instruction D-21 states that "[i]n a civil action such as this, if a witness refuses to testify on the grounds of his Fifth Amendment right against self-incrimination, you the jury, may draw an adverse inference from the [d]efendant's refusal to testify." Wright objected to this language and the trial judge modified the instruction by removing the phrase "adverse inference" and replacing it with "whatever conclusion you believe proper." The modified instruction was then offered to the jury.
¶ 42. On appeal, the Gibsons argue that jury instruction D-21 should have been offered to the jury unmodified because an adverse inference may be drawn from a civil defendant's refusal to answer questions based on the Fifth Amendment. However, as noted above, this particular rule of law, as true as it may be, has only been applied in Mississippi to the actual parties of a civil action. See Harrell, 593 So.2d at 5-6; Knapp, 536 So.2d at 1334; Morgan v. United States Fid. and Guar. Co., 222 So.2d 820, 828 (Miss.1969). Boone was not a party to this action. The unmodified instruction was not a correct statement of the law because it called for an adverse inference due to the "defendant's" refusal to testify. This simply was not true. In reviewing the record, we find the instructions, read as a whole, fairly announce the law of the case and create no injustice to the Gibsons.
¶ 43. Moreover, if a party wishes to preserve error on the refusal of a proposed jury instruction, he must specifically object before the instruction is presented to the jury. Lewis v. Hiatt, 683 So.2d 937, 944 (Miss.1996). There is no indication in the record that the Gibsons objected to the modified instruction before it was offered to the jury. We find the Gibsons's final issue to be without merit.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, P.J., BRIDGES, THOMAS, LEE, IRVING, AND CHANDLER, JJ., CONCUR. SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., LEE AND GRIFFIS, JJ.
SOUTHWICK, P.J., concurring:
¶ 45. I disagree with the majority regarding the testimony of Anthony Boone the person who murdered Jeffery Henderson. The majority states that the procedural rules controlling the invocation of the privilege against self-incrimination apply only to party-witnesses. That has never been the holding or rationale of any precedent that I have found. However, no reversible error resulted from the trial court's approach.
¶ 46. In addition, respectful of the majority and of the Supreme Court that has set the boundaries for tort law, this case puts in relief the inequities that may arise in the present approach to premises liability. In Mississippi, businesses are liable for injuries caused by criminals essentially as a matter of jury discretion. The question is whether the business did as much as it could have to guard against reasonably anticipatable threats. That is in my view a doubtful policy decision. These *1261 judge-made rules should be reexamined by those who have the authority to do so.
1. Invocation of right against self-incrimination
¶ 47. The person who pled guilty to murdering the plaintiff-decedent gave a partial deposition in this case. After stating that he and the decedent were involved in a drug transaction, the murderer refused to answer any more questions unless he was paid for his statement. After being rebuffed, the deponent claimed a right against self-incrimination. That right is certainly a recognized one but it may not exist as to this witness who pled guilty to the crime for which he subsequently claimed a right against self-incrimination.
¶ 48. The first objection to the procedure followed by the trial judge is that he did not allow all the questions to be asked by counsel. The majority states that case law requiring the following of that procedure applies only to witnesses who are also parties. The plaintiff offers that distinction about the precedents, but with respect, the majority has accepted that too readily. Regardless of the facts of the few cases on the subject, the statement of principle has never limited the requirements just to party witnesses. For example, this statement of the rule appears:
In a criminal prosecution the privilege provides that an individual may not be required to take the witness stand at all. But this is because of the practical reality of juror prejudice and misunderstanding should the individual have to invoke his privilege on a question by question basis. Experience and common sense have taught that the only way the privilege may in fact be secured in a criminal prosecution is that the accused have the right, if he wishes to exercise it, not to take the witness stand at all. Such considerations have no application in civil proceedings, particularly where, as here, a party is merely being required to submit to deposition. Here we do proceed on a question by question basis.
"[T]he claim of privilege in a civil case is to be determined by the court and not by the witness as in a criminal case." When a witness desires to claim the privilege of the Fifth Amendment, "[h]e is required to give the court sufficient information for the court to determine, in fact, that answering the question would tend to incriminate the witness." Hinds County Board of Supervisors v. Common Cause, 551 So.2d 107, 112 (Miss.1989).
Harrell v. Duncan, 593 So.2d 1, 5-6 (Miss. 1991) (some internal citations omitted).
¶ 49. It is evident that this explanation makes no reliance on whether the witness is a party or not. Under an evidentiary rule, no person has a right not to be a witness or to refuse to disclose any matter unless a specific privilege or other right exists. M.R.E. 501. As one author explained, the "Supreme Court has provided guidelines to assist judges in determining when a witness in a civil case may invoke the privilege against self-incrimination" under the constitution. Steven J. Allen, Evidence § 34:46, in 4 ENCYCLOPEDIA OF Miss. LAW (Jeffrey Jackson & Mary Miller ed.2001). One will look in vain for the distinction made by the plaintiff on appeal and accepted by the majority, that the rules for civil witness claims of self-incrimination apply only to party witnesses.
¶ 50. What is required is that the trial judge permit a civil witness to be asked every question and have the refusal to answer separately analyzed by the trial judge. In re Knapp, 536 So.2d 1330, 1334 (Miss.1988). There must be enough explanation from the witness for the judge to decide whether an answer to a question would tend to incriminate. Hinds County *1262 Bd. of Supervisors, 551 So.2d at 112. The trial judge failed in both particularsthe defense was not allowed to ask all of its questions, nor did the judge ever determine whether the claimed privilege was valid.
¶ 51. Before finding reversible error in the failure to permit each question to be asked and then an analysis of the propriety of the privilege determined, I search for prejudice from the trial judge's errors. The principal question that apparently concerned the defense was asked, namely, whether the murderer's encounter with his victim at the laundromat was because of the victim's unpaid drug debt. The key question apparently was this:
DEFENSE COUNSEL: Mr. [Anthony] Boone, isn't it true that on the day that Jeffrey Henderson was killed, ... Mr. Henderson owed you and David Young money for a past drug debt that had not been paid? Isn't that true?
THE COURT: Okay. That's it.
¶ 52. There is nothing in the record indicating that Boone refused to answer this question, but he had refused all previous ones of any substance. The Court allowed no further questions to be asked. Prior to that time, the witness had stated several times that he would not answer any questions.
¶ 53. The failure to permit all questions to be asked and the failure to make individual determinations of applicability of the privilege are related issues on this appeal. Defense counsel never asked for an individual determination of the application of the privilege as to each question.[2] The evidence is that the witness had already pled guilty to the murder of Mr. Henderson. Boone was in the custody of the Mississippi Department of Corrections with a life sentence for that murder. I find no reference to a transcript from the necessary hearing when Boone pled guilty; presumably nothing was of use to the defense in the civil case from that.
¶ 54. Whatever was admitted at the guilty plea under oath was no longer subject to a claim of a privilege against selfincrimination. "The yardstick of adjudication to be used by the courts in ruling upon the privilege in a civil case is whether there is a real and substantial hazard of incrimination resulting from a witness's... testimony in open court." Morgan v. U.S. Fid. & Guar. Co., 222 So.2d 820, 829 (Miss.1969). Even if Boone at his guilty plea hearing did not admit to a prior connection with the deceased, exploring that issue at this civil trial might still not have incriminated him. However, if Boone had stated under oath during his plea different facts from what he was stating at this civil trial, issues of perjury would arise. That is why the assessment of each individual question at a civil trial is critical. That is why it does not matter whether it is a party witness or not.
¶ 55. There is no defense counsel request for the trial court to make an individual determination of the applicability of the privilege to each question. The trial judge acknowledged during the discussion about jury instructions that he had never decided whether Boone any longer had a privilege against self-incrimination relating to the events for which he had pled guilty. The judge indicated that he would rule on that question, but I find no ruling in the record.
*1263 ¶ 56. Since there was no effort to get an individual ruling on each question, the failure to permit all questions to be asked was harmless error. Further, the trial court cannot be put in error for refusing to determine whether the privilege against self-incrimination was validly being exercised when no one requested that he do so at the time of the questioning. It did become an issue later after both sides had rested, and then again in post-trial motions. That is too late.
¶ 57. I disagree with the majority that the trial judge correctly handled the Boone claim of privilege, but I find no reversible error.
2. Business premise liability rules
¶ 58. The rule of liability for business premises owners in Mississippi for criminal acts of strangers has radically changed in the last two decades. Very haltingly in 1982, the Supreme Court recognized that a business owner had a duty to protect a patron's safety. Kelly v. Retzer & Retzer, Inc., 417 So.2d 556, 560 (Miss.1982). However, that duty did not extend to providing armed guards. Quoted were cases from other jurisdictions, such as these:
[T]o ask this store or any other small business to do more, such as hiring full time armed guards in fear of any potential robbery would make this burden of prevention extremely high and in all likelihood make the cost of running a small business prohibitive.
Kelly, 417 So.2d at 562, quoting Roberts v. Tiny Tim Thrifty Check, 367 So.2d 64, 65 (La.App.1979).
This court is all too familiar through daily police reports of the high incidents throughout the entire city of such crimes as mugging, purse snatching, assault and robberya constant hazard to all law abiding persons who use the streets and public places of business. But simply because this hazard exists, it does not follow that the common law of negligence imposes an obligation upon private enterprises to provide armed guards to insure the safety of persons invited to do business with them.
Kelly, 417 So.2d at 561, quoting Cook v. Safeway Stores, Inc., 354 A.2d 507, 509 (D.C.App.1976).
¶ 59. In time the Court made clear that it rejected any absolute limits on the duty of business owners. Instead, the requirement was to exercise reasonable care in the circumstances, judged by the foreseeability of assaultive behavior. A "`cause to anticipate' the assault may arise from (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists in the tavern." Lyle v. Mladinich, 584 So.2d 397, 399 (Miss.1991), quoting Grisham v. John Q. Long V.F.W. Post, 519 So.2d 413, 416 (Miss.1988). This standard for liability remains the law. WEEMS & WEEMS, MISSISSIPPI LAW OF TORTS § 5:10 (2002); Corley v. Evans, 835 So.2d 30, 38-39 (Miss.2003).
¶ 60. Thus by the early 1990s, the duty of a business premises owner was measured by foreseeability of violence by the particular criminal or knowledge of an "atmosphere of violence."
¶ 61. I do not contest the reasonableness of a focus on foreseeability. My concern is the direction that the analysis then takes. There is a duty imposed on a business owner "to exercise reasonable care to protect the invitee from reasonably foreseeable injury at the hands of other patrons." Lyle v. Mladinich, 584 So.2d 397, 399 (Miss.1991). What is reasonable appears in the caselaw to turn solely on what will be effective in light of the foreseeable harm. The actual language of the standarda duty to exercise reasonable care *1264 would permit consideration of the reasonableness of the protective measures in light of more than just their effectiveness, but I find no precedents that do so. Mississippi caselaw appears to examine reasonableness solely from the perspective of prevention.
¶ 62. To show that many courts disagree with this approach, I quote from one author's efforts to summarize American law on the subject:
A few courts interpret the foreseeability requirement quite narrowly. These courts refuse to find a foreseeable criminal attack unless the landowner knew or should have known that crimes were occurring on the premises and that an attack was imminent. Under this "imminent harm" test, simply presenting evidence of previous crimes on or around the premises may not suffice to demonstrate that the landowner reasonably could have anticipated the criminal act.
Another minority of courts falls at the other end of the spectrum and takes a much broader view of the element of foreseeability. These jurisdictions adhere to the "totality of the circumstances" test first enunciated by the California Supreme Court in Isaacs v. Huntington Memorial Hospital, [38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653 (1985), overruled by Ann M. v. Pacific Plaza Shopping Ctr., 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993)]. In Isaacs, the court found that the foreseeability of the shooting of a doctor in a hospital parking lot presented a jury question. Under the "totality of the circumstances" approach, no single factor is requisite to a finding of foreseeability. Thus, in assessing the foreseeability of the crime in Isaacs, the court considered a number of circumstances, such as the occurrence of previous crimes on the defendant's property, the rate of crime in the surrounding area, and the level of security in the parking lot.
Two courts have developed a variation of the "totality of the circumstances" test. [Ann M., 25 Cal.Rptr.2d 137, 863 P.2d 207; McClung v. Delta Square Ltd. Partnership, 937 S.W.2d 891 (Tenn. 1996).] Under the so-called "balancing approach," the court weighs the foreseeability of the act against the burden of guarding against it. The court may consider a variety of factors, including the probability and gravity of the harm, the utility of the actor's conduct, and the feasibility and costs of alternative conduct.
Finally, some jurisdictions utilize a "prior similar incidents" approach to landowner liability. The origins of this rule can be found in Kline [Kline v. 1500 Massachusetts Ave. Apartment Corp., 439 F.2d 477 (D.C.Cir.1970)]. Recall that the plaintiff in Kline offered evidence of earlier assaults and robberies in the common areas of the building and in the area immediately adjacent to the property. The prior occurrence of crimes substantially similar to the attack on the plaintiff was crucial to the court's analysis of the landlord's duty. These acts "`created a likelihood' (actually, almost a certainty) that future criminal attacks upon tenants would occur." Because the attack was reasonably foreseeable, the landlord owed a duty of care to the tenant.
The "prior similar incidents" rule is distinguishable from the "totality of the circumstances" approach in that, under the latter rule, a duty may be found in the absence of any prior similar crimes on or near the premises. The court may consider and weigh a wide range of factors including the occurrence of prior crimes on the premises (even if they are *1265 different in nature and location), evidence of general criminal activity in the surrounding area, the nature of the business operated on the property, and the physical design of the property.
W. Marshall Sanders, "Between Bystander and Insurer: Locating the Duty of the Georgia Landowner to Safeguard Against Third-Party Criminal Attacks on the Premises," 15 GA. ST. U.L.REV. 1099, 1109-11 (1999) (footnotes omitted).
¶ 63. In Mississippi, our focus on the overall pattern of criminal activity or on knowledge of the perpetrator's violent tendencies may place us in what the justquoted author labeled the "totality of circumstances" approach, though the "prior similar incidents" terminology is also used. Regardless of the label, what I find should be injected into the question of liability is not just foreseeability, but also the reasonableness of the measures that allegedly must be taken. The Mississippi Supreme Court embraced that limitation in the earliest precedent that I have quoted. "[T]o ask this store or any other small business to do more, such as hiring full time armed guards in fear of any potential robbery would make this burden of prevention extremely high and in all likelihood make the cost of running a small business prohibitive." Kelly, 417 So.2d at 562, quoting Roberts v. Tiny Tim Thrifty Check, 367 So.2d 64, 65 (La.App.1979).
¶ 64. The plaintiff's position in this case is that the laundromat should have responded to the suggestions made to have security guards as well as take other steps to protect patrons in this neighborhood of fairly frequent violent assaults. This business, if not literally a nickel and dime operation, was perhaps a quarters and dollar bill location. One size for reasonable conduct does not fit all businesses. The question should not only be what it would take to prevent crime, but what is reasonable for this defendant to have done in light of its size, location, and profitability. I find that the foreseeability of the assault should be balanced with the burden of the measures necessary to prevent it. Among the considerations can be the "probability and gravity of the harm, the utility of the actor's conduct, and the feasibility and costs of alternative conduct." Sanders, "Between Bystander and Insurer," 15 GA. ST. U.L.REV. at 1110 (1999).
¶ 65. In the abstract, human safety cannot have a dollar sign attached. But businesses do not operate in the abstract. The present liability rules for criminality too readily prevent certain businesses in certain locations to operate at all. That should not be the effect of tort liability. If what is reasonable as preventive measures end before an abstractly desirable degree of safety is reached, that simply emphasizes what should not just be a throwaway line in the jurisprudencethe business owner cannot be the insurer of the safety of its patrons. The measure of safety that is achieved is a group effort involving the business, the patrons, and law enforcement officials.
¶ 66. In light of current law which is binding on this Court, I agree that we should affirm.
McMILLIN, C.J., LEE AND GRIFFIS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] T.G.'s Washout is a coin operated laundromat. The business offers self-service coin operated laundry facilities as well as a "fluff-n-fold" service whereby customers can leave their laundry with the employees to be washed, dried, and ironed.
[2] Defense counsel seemed primarily interested in receiving an adverse inference instruction as a result of Boone's refusal to answer questions. The majority adequately addresses why the denial of the instruction was proper. The adverse inference instruction only applies to civil parties who refuse to testify; a party should not have an adverse inference imposed because someone other than the party refused to testify.