MYERS, J.,
for the Court:
¶ 1. Fred Lenard Jr. was convicted after a jury trial in the Coahoma County Circuit Court of capital murder, kidnapping, and felony child abuse. Lenard was sentenced to life imprisonment without the possibility of the parole for murder and to thirty years for each of the other counts. The sentences were ordered to be served consecutively, all in the custody of the Mississippi Department of Corrections. Lenard appeals, contending that the trial court erred in admitting evidence of prior bad acts, hearsay, and photographs of the victim. Lenard also argues that the jury’s verdict is against the overwhelming weight of the evidence. Finding no reversible error, we affirm Lenard’s convictions and sentences.
FACTS
¶ 2. In 2008, Lenard was involved in a relationship with twenty-seven-year-old Katrina Dumas of Clarksdale, Mississippi, a single mother of two. The relationship had been ongoing for several years, and Lenard was the father of Katrina’s three-year-old son, Fred Dumas, who was called “Little Fred” to distinguish him from his father and two of Lenard’s other sons, who all shared the name Fred. Katrina had recently obtained a child support order against Lenard and started a relationship with another man.
¶ 3. On April 23, 2008, the Dumas family became concerned when Katrina and Little Fred did not return from a brief errand. Around noon, Katrina had been at her parents’ house and left in her father’s 1998 Cadillac to deliver a lunch to her brother. Katrina called her mother to say she had sold the lunch[1] and would come back to get another plate. This was the last the family would hear from Katrina, who never made it home. At approximately 2:15 p.m., Lenard called Katrina’s parents and asked if Katrina had “made it back yet.” Katrina did not answer her cell phone, and when she failed to pick up her nine-year-old daughter Rhodeisha from school, the family began searching for her. Later that afternoon, Rhodeisha and her maternal grandmother, Catherine Dumas, spotted Lenard driving the Dumases’ Cadillac near the senior Dumases’ home. Catherine and Rhodeisha went searching for the vehicle, which they found about ten minutes later, abandoned on Ashton Alley in Clarksdale. The hood was still warm, and the car was covered in mud, though it had been clean when Katrina took it earlier that day. The Dumases called the police. The doors were locked, and when they were opened by the responding officers, blood was found in the passenger area. A large amount of her blood was also found in the trunk, as well as hair and mud. The blood was later determined to be Katrina’s. At trial, one of the State’s witnesses testified that he had seen the Cadillac in the alley and a “big and stocky” black *533 man — who appeared to be nervous — exit it and walk to another street. The man got into a red car and left, with another person driving.
¶4. The same day, Lenard had picked up his uncle, Marshall Ross, to work on Lenard’s house. Ross testified that some time that morning, Lenard had taken a phone call in private. The two worked in the house until approximately 11:45 a.m., when Lenard left. Ross continued working, but around 2:30 p.m. he went fishing with Lenard’s parents. Ross returned to Lenard’s house later that afternoon. Lenard did not come home until some time after 5:00 p.m. When Lenard returned, his wife was with him, and Lenard had changed his clothes. Lenard asked Ross to say he had borrowed Lenard’s vehicle— a red Pontiac Aztek — that afternoon and left it parked on Ashton Street between noon and 2:00 p.m. Ashton Street is near Ashton Alley where the Dumases’ Cadillac was found.
¶ 5. A search was organized for Katrina and Little Fred. Around 5:00 p.m. the next day, Little Fred was found alive by his half-brother, Fred Aikens. Aikens was the twenty-three-year-old son of Lenard and a former wife. Aikens testified that he had been told by a member of his mother’s family — who had heard it from another family member — that Katrina was dead, but Little Fred was alive; and the two would be found tied to a tractor tire near the Pleasant Grove Church in Sher-ard, Mississippi. Pleasant Grove was the church Lenard and his family attended. Aikens did not know the original source of the information. In the woods near the church, Aikens found Little Fred alone, “hogtied,” lying face-down in a ditch in a wooded area near the church. Little Fred’s hands and feet had been bound together behind his back with wire. He was cold, wet, hungry, and covered with insect bites. Little Fred had also been bitten by a snake; had bruises on various parts of his body; injuries to his wrists and ankles from the bindings; and swelling in his face, hands, and feet. He was taken to a nearby hospital, where he repeatedly stated: “My daddy did it.”
¶ 6. On the evening of April 25, Katrina’s body was found in brush near a cemetery approximately a mile and a half from where Little Fred had been found the day before. The body was nude and had been covered with vines. A piece of steel wire was found tied around Katrina’s neck.
¶ 7. Dr. Steven Hayne examined the body, and he determined that Katrina had been killed by strangulation. She had numerous other injuries, including an injury to her skull that appeared to have been caused by a tire iron — the tire iron kept in the Cadillac was missing. The head injury was nonfatal, but it had likely caused a concussion and some period of unconsciousness. Katrina also appeared to have defensive wounds to her hands and arms.
¶ 8. Lenard was arrested, and he was noted by multiple witnesses to have had scratches on his hands, forearms, and legs after Katrina’s disappearance. Lenard gave a statement to the Clarksdale Police Department. He claimed that on April 23, he dropped his wife off for work at 7:45 a.m., then called Katrina. He met her and Little Fred at a local grocery store, and they ate breakfast together at a fast-food restaurant. Lenard then left to pick up his uncle, Ross, to work on Lenard’s house. Lenard stated that he stayed at the house until he left to pick up his wife from work and their son from daycare later that afternoon.
¶ 9. Little Fred was four years of age at the time of the trial. He testified that the last time he saw his mother, Lenard was driving the Dumases’ Cadillac and took Little Fred and Katrina to a “pink *534 church.” He saw Lenard “hurt” his mother, and when Lenard put him in woods, Katrina could not protect him because “blood came out of her nose.” Little Fred also testified that Lenard put a “string” around Katrina’s neck.
¶ 10. The State also offered testimony that Lenard had been abusive toward Katrina in the past and had threatened her life on more than one occasion. On January 29, 2008, Katrina had called the Clarksdale police for a domestic disturbance, complaining that Lenard had come to her home to fight. The police gave Lenard a “courtesy ride” to another location. Rhodeisha testified that Lenard became angry when Katrina would not answer his phone calls. He had taken Katrina into the woods, pointed a gun at her, and threatened to kill her. The night before she was killed, Lenard had been at Katrina’s home, angry, and was “acting like he was going to hit her.” Lenard was described as sometimes acting erratic or “crazy” during these incidents. The State also produced one of Lenard’s ex-wives, Yolanda Lester, who testified that shortly after their divorce, Lenard had strangled her with a wire until she passed out, in a manner similar to how Katrina was killed.
¶ 11. Lenard did not testify in his own defense, but he did offer the testimony of his two sisters, who stated that Lenard and Katrina had a good relationship. They testified that Lenard’s ex-wife, Lester, had fought with Katrina and threatened her life, and the two had “bought guns for each other.” Lenard’s witnesses also stated Katrina was involved in the drug trade, and it was established through other evidence that marijuana plants were found growing in the brush near where her body was found. Several witnesses stated that they had heard Katrina’s voice in the woods around the time Little Fred was found. Also, a Mississippi Department of Human Services employee testified that Lenard had acknowledged paternity and signed all the necessary documents for a “voluntary” child support order and withholding to be entered.
¶ 12. The jury convicted Lenard of capital murder, kidnapping, and felony child abuse. He appeals from that judgment.
STANDARD OF REVIEW
¶ 13. We review the trial court’s eviden-tiary rulings for an abuse of discretion, which may be found only if the decision is not supported by substantial credible evidence or where “the reviewing court has a definite and firm conviction that the court below committed a clear error of judgment and [in the] conclusion it reached upon a weighing of the relevant factors.” Withers v. State, 907 So.2d 342, 345 (¶ 7) (Miss. 2005) (citation and quotations omitted). Even if this Court finds an erroneous admission or exclusion of evidence, we will not reverse unless the error adversely affects a substantial right of a party. Gibson v. Wright, 870 So.2d 1250, 1258 (¶ 28) (Miss.Ct.App.2004). “In other words, the admission or exclusion of evidence must result in prejudice or harm if the cause is to be reversed on that ground.” Harper v. State, 887 So.2d 817, 829 (¶ 57) (Miss.Ct.App.2004).
DISCUSSION
1. Prior Bad Acts
¶ 14. This issue concerns the testimony of Lester, Lenard’s ex-wife. She testified that a few days after their divorce, Lenard forced his way into her home and strangled her with a piece of wire. Lenard had cut the wire from a lamp on Lester’s porch before knocking on her door. When she refused to let him inside, Lenard forced his way inside and strangled her with the *535 wire. During the attack, Lenard told Lester: “Bitch, if I can’t have you, I’m killing you tonight.” She begged for her life, asking Lenard for mercy because she had two children. Lenard responded, “so,” and continued strangling Lester until she passed out. When Lester awoke, Lenard was going through her cell phone. Lenard then choked her again but stopped when Claude Burks, a friend of his, came home.[2]
¶ 15. The State offered Lester’s testimony to show Lenard’s “identity, motive, and plan” under Mississippi Rule of Evidence 404(b), on the theory that the prior attack was similar to the one in which Katrina was killed. On appeal, Lenard contends that the similarities between the incidents are superficial and that the testimony was improperly admitted as character evidence. He argues that it only served to show the jury that Lenard had been violent toward another woman, leading them to conclude that he was more likely to have been violent toward Katrina. Lenard contends that Lester’s testimony was used for the improper purpose of showing “the character of a person in order to show that he acted in conformity therewith.” M.R.E. 404(a).
¶ 16. We find this argument procedurally barred on appeal. At trial, Lenard objected to the admission of Lester’s testimony, but only on specific and limited grounds. He did not argue that it was improper character evidence; instead, he gave two reasons for his objection. He first pointed out that the events had occurred seven years before Katrina’s death, without elaborating further or stating the significance of this fact. Lenard’s principal argument in the objection was that Lester’s testimony was not credible because Lenard had never been convicted of a crime in the assault on Lester. When asked by the trial judge to clarify whether this objection was to the credibility of the testimony, Lenard’s counsel stated:
Yes, sir, it does go to the credibility issue, but they are asking to raise alleged prior bad acts that have not been proven, that have not been tested in court. Anybody can walk in here and say anything about Fred Lenard since he’s on trial and since he’s the defendant, and we believe that the rules are designed to protect against that kind of thing, because what they’re doing is saying that this is evidence of motive and intent, but the allegations, according to him, are untrue as regarding the ex-wife.
¶ 17. “Objections to evidence must bring to the attention of the trial judge the specific ground on which it is contended such evidence is inadmissible so that the trial judge may determine whether or not such evidence is available to objector’s adversary.” Stringer v. State, 279 So.2d 156, 158 (Miss.1973) (quoting Boring v. State, 258 So.2d 251, 258 (Miss.1971)). “[A]n objection on one or more specific grounds constitutes a waiver of all other grounds.” Brown v. State, 682 So.2d 340, 350 (Miss.1996).
¶ 18. As Lenard did not object at trial on the grounds he now seeks to advance on appeal, this issue is procedurally barred.
2. Hearsay
¶ 19. In this issue Lenard attacks several admissions of hearsay evidence by the trial court. Hearsay is defined as “a statement, other than one made by the declar-ant while testifying at the trial or hearing, *536 offered in evidence to prove the truth of the matter” and is generally not admissible at trial. M.R.E. 801(c); M.R.E. 802. There are, however, numerous exceptions to the rule against hearsay.

A. Little Fred’s Statements at the Hospital

¶ 20. The first sub-issue concerns Little Fred’s statements made in the hospital shortly after he was found tied up in the woods, the day after his mother’s murder. The trial court allowed these statements to be repeated as hearsay by an emergency-room nurse and by Andrew Thompson, the Coahoma County Sheriff, who briefly interviewed the child a short time after he made the statements to the nurse.
¶ 21. The trial court admitted the testimony, citing three hearsay exceptions, provided by Mississippi Rules of Evidence 803(1) (present-sense impression), 803(3) (then-existing mental condition), and 803(24) (the “catch all” exception for trustworthy hearsay). Lenard argues vigorously that none of these are applicable. We find that a discussion of those exceptions would be academic, since the testimony was clearly admissible under Rule 803(2) as an excited utterance. “It is well established in our jurisprudence that the right result reached for the wrong reason will not be disturbed on appeal.” Green v. Cleary Water, Sewer & Fire Dist., 17 So.3d 559, 572 (¶ 42) (Miss.2009).
¶ 22. Rule 803(2) provides an exception to the rule against hearsay for “excited utterances.” The rule defines this as a statement “relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” The official comment to the rule elaborates:
The underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication.... [T]he essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly....
¶ 23. Nothing in the record suggests that Little Fred was not still under the excitement of the incident at the time the statements were made. He had witnessed his mother’s murder, been bound, carried into the woods, and left in a ditch overnight. Little Fred was covered by insect bites, bitten by a snake, and rained on while lying face-down in the ditch. When he was found, the child was observed to be suffering from exposure and injuries from the bindings, and he had little opportunity to recover before giving the statements.
¶ 24. The accounts of the witnesses consistently described Little Fred as agitated when he was found. He was immediately taken to a hospital in Clarksdale, and all of the statements at issue were made a short time after his arrival there. First, Little Fred spoke to a nurse. He “whined,” complaining that he was hungry and asking for food. Little Fred asked what was being done to him. The nurse then asked Little Fred: “What happened to you?” He responded by repeatedly stating: “My daddy did it.” He would not elaborate when asked what his father had done. About fifteen minutes after his arrival at the hospital, Little Fred was briefly interviewed by Sheriff Thompson. The sheriff testified that when he arrived, the nurses were still trying to calm the child. Initially, Little Fred would not respond to the sheriffs questions, but after being calmed somewhat by a nurse, he responded to the question: “Who made these marks on you?” by saying, “My daddy.” Little Fred *537 would not answer further questions. At that point, Sheriff Thompson “backed off’ so as not to interfere with the child’s treatment.
¶ 25. We find that the statements were spontaneous, as defined by Mississippi law. “The mere fact that the statement ... was in response to an inquiry ... does not necessarily take [it] outside the realm of admissible excited utterances.” Barnett v. State, 757 So.2d 323, 330 (¶ 18) (Miss.Ct.App.2000) (citing Sanders v. State, 586 So.2d 792, 795 (Miss.1991)). In fact, the Mississippi Supreme Court has held that “[w]here the excited utterance is prompted by a simple question, even from an officer, such as ‘What happened?’ or ‘What’s wrong?’ ” it may still fall under the exception. Carter v. State, 722 So.2d 1258, 1261 (¶ 10) (Miss.1998) (citations omitted).
¶ 26. Little Fred’s hearsay statements were admissible as excited utterances, so we find no error in their admission into evidence.

B. Katrina’s Statements to Ranaildi Haynes

¶ 27. Lenard’s second hearsay issue concerns the testimony of Katrina’s friend, Ranaildi Haynes. Haynes testified that a few months before Katrina’s death, he had loaned her $100 to buy a purse. A few days before Katrina disappeared, he spoke with her on the telephone, and she told him that Lenard had been asking who bought her the purse. Katrina told Haynes she planned to end her relationship with Lenard and was going to tell him that she was seeing another man. Before the testimony was heard at trial, Lenard objected to it as hearsay. After a somewhat confusing argument, the trial judge overruled the objection, finding that Haynes’s testimony would not be hearsay.
¶ 28. On appeal, the State concedes that Haynes’s testimony was hearsay. However, it contends that there was no error in admitting the testimony because it fell under the hearsay exception for a statement of then-existing mental condition, Mississippi Rule of Evidence 803(3). We agree.
¶ 29. Rule 803(3) provides an exception to the rule against hearsay for “[a] statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed.... ” The official comment to the rule adds that “statements which indicate intention to do something in the future are admissible to prove that the act intended took place.”
¶ 30. Haynes testified that Katrina told him of her plan or present intent to tell Lenard she was ending their relationship. Rule 803(3) allows statements of plan or intent, and this “encompasses relevant statements made by murder victims before their death[s].” Harris v. State, 861 So.2d 1003, 1019 (¶ 42) (Miss.2003). Since this testimony was admissible as an exception to the hearsay rule, we find no error in the trial court’s decision to allow it.
3. Photographs of Victim
¶ 31. Next, Lenard challenges the trial court’s decision to admit various photographs of the victim’s body into evidence. A series of photographs in S-21 show Katrina’s nude body as it was found in the woods: S-21i shows the body from a distance; S-21j shows it from closer up; S-21k shows Katrina’s legs and feet; S-21m shows Katrina’s body from another angle; and S-21n shows the injuries to Katrina’s right shoulder and the back of the right side of her head and face. Exhibits S-7a and S-7b were taken at the morgue. They show the injuries to Katri *538 na’s neck and face, respectively, with the wire still wrapped around her neck. S-23 is a series of seven photographs taken during Dr. Hayne’s examination of the body, showing injuries to Katrina’s neck, arms, hands, and torso. On appeal, Lenard contends that the photographs are cumulative and overly gruesome.
¶ 32. The Mississippi Supreme Court has held:
Admission of photographs by the trial court is reviewed for abuse of discretion. A decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion. The discretion of the trial judge is almost unlimited regardless of the gruesomeness, repetitiveness, and the extenuation of probative value. Some probative value is the only requirement needed in order to support a trial judge’s decision to admit photographs into evidence. So long as a photograph has probative value and its introduction serves a meaningful eviden-tiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory. A photograph has a meaningful evidentiary purpose when it: (1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony.
Chamberlin v. State, 989 So.2d 320, 340 (¶ 73) (Miss.2008) (citations and quotations omitted). “In order to exclude any photograph, the trial court would have [to find] that, pursuant to Mississippi Rule of Evidence 403, the probative value of such photograph was substantially outweighed by the danger of unfair prejudice.” Id. at 341 (¶ 79).
¶ 33. With that deferential standard of review in mind, we have reviewed the photographs and the accompanying record. Each of the photographs has some probative value, and it appears that the trial judge carefully considered the threat of unfair prejudice before allowing each photograph into evidence. Several photographs offered by the State, although relevant, were excluded by the trial court because of their graphic content. We cannot find that the trial court abused its broad discretion in allowing the others that are now challenged on appeal. This issue is without merit.
4. Weight of the Evidence
¶ 34. In his final issue, Lenard contends that the jury’s verdict is against the overwhelming weight of the evidence. The Mississippi Supreme Court has detailed how our appellate courts must review the weight of the evidence supporting a jury’s verdict, stating:
When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.... However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather ... [the reviewing] court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005) (internal citations and quotations omitted). The supreme court also warned that a challenge to the weight of *539 the evidence “is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id. (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
¶ 85. In arguing this issue, Lenard contends that the Dumas family suspected him in Katrina’s disappearance from the beginning. He claims they manufactured or imagined much of the evidence against him. He specifically points to Rhodeisha’s testimony that she alone saw Lenard driving the Dumases’ Cadillac the day Katrina disappeared, whereas Catherine Dumas testified she also saw Lenard driving the vehicle.
¶ 86. Lenard also points to several weaknesses in the case against him. No fingerprints, scrapings, or other trace evidence tied him to the crime. The only direct evidence of his involvement came from Little Fred, whose testimony at trial was broken and difficult. In his testimony, Little Fred was asked repeatedly who his “daddy” was. Several times he initially stated that his “daddy” was named “Rodney” — apparently referring to Rhodeisha’s father — before correcting himself to identify Lenard as his father. This was explained in other testimony as something the child had started doing after his parents had disappeared from his life. Lenard also points to what he asserts are inconsistencies in the accounts describing the clothes he was seen wearing at various times during the day of the murder.
¶ 37. After reviewing the record, we do not find that Lenard’s convictions are against the overwhelming weight of the evidence. As discussed above, there was significant evidence, both circumstantial and direct, of Lenard’s guilt. Lenard’s arguments primarily concern the credibility of witnesses and the resolution of conflicting inferences or testimony. “The jury is the sole judge of the weight of the evidence and the credibility of the witnesses.” Nix v. State, 8 So.3d 141, 146 (¶ 26) (Miss.2009) (quoting Mohr v. State, 584 So.2d 426, 431 (Miss.1991)). Conflicts in the evidence are for the jury to resolve. Whittington v. State, 377 So.2d 927, 929 (Miss.1979). We cannot say that the jury’s verdict is against the overwhelming weight of the evidence. This issue is without merit.
¶ 38. THE JUDGMENT OF THE CIRCUIT COURT OF COAHOMA COUNTY OF CONVICTION OF COUNT I, CAPITAL MURDER, AND SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE; COUNT II, KIDNAPPING, AND SENTENCE OF THIRTY YEARS; AND COUNT III, CHILD ABUSE, AND SENTENCE OF THIRTY YEARS, ALL TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO COAHOMA COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE AND ROBERTS, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION JOINED BY BARNES, CARLTON AND RUSSELL, JJ.

. Katrina and her mother had been selling lunches to raise money for their church; her father was the pastor there.

. It is not clear from the testimony whether Burks lived in the same home as Lester or somewhere nearby.